[No. G028717. Fourth Dist., Div. Three. Oct. 29, 2001.]

In re the Marriage of PAMELA L. and VICTOR J. LOH.
PAMELA L. LOH, Respondent, v.
VICTOR J. LOH, Appellant.

---

**COUNSEL**

Jeffrey W. Doeringer for Appellant.

Bill Lockyer, Attorney General, Charlton H. Holland III, Assistant Attorney General, Frank S. Furtek and Mary Tilton, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Respondent.*

---

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

In this child support modification case, the mother, a successful insurance agent, tried to upwardly modify a child support order against her ex-husband, a recently unemployed stockbroker who had just lost his license and started an unrelated business, without first obtaining his most current tax returns. Rather, she merely presented "lifestyle" evidence based on a series of photos showing her ex-spouse at the home of his girlfriend and in or by a series of cars. Based on this evidence, the trial judge found that the ex-spouse had a "nontaxable" income of $9,000—a figure which appears to have been plucked from thin air. The ex-spouse's income and expense declaration, otherwise noncontroverted at the hearing, showed at most a gross income of $68,000 over the previous 12 months, and that before taxes. We reverse the ensuing child support order. Evidence of lifestyle, particularly a lifestyle subsidized by a new "nonmarital partner" (see Fam. Code, § 4057.5), is not a cheap substitute for proper discovery of income reported on tax returns.

---

*Technically, the Attorney General's Office appears pursuant to Family Code section 17406, subdivision (a) of which provides in part that "In all actions involving . . . support . . . the local child support agency and the Attorney General represent the public interest in establishing, modifying, and enforcing support obligations." In context of this case, this office's appearance is, in substance, that of a friend of the court on behalf of the respondent, who is not otherwise represented on appeal.

## II. FACTS

Pamela L. and Victor J. Loh were divorced in July 1997. Pamela was an insurance agent and Victor was an investment adviser. The stipulated judgment provided that Victor would pay Pamela $416 a month for each of their three children. The judgment was based on Victor earning $5,400 each month after business expenses and before taxes; and on Pamela earning $1,500 per month before taxes.

A little more than a year later, in October 1998, Pamela filed an order to show cause proceeding (OSC) for an upward modification of the child support payments to the "guideline" level; she had just had a very bad month in her work as an insurance agent, and had been assessed a number of "charge backs" from previous commissions. The net result was that she had a negative income of $5,000 that month. Longer term, however, things were somewhat better, and she was still averaging about $4,000 a month gross income for the previous 12 months.

Victor was not served with the OSC until sometime after June 1999. By then, Pamela's net disposable income had increased to about $4,800 a month, and she had averaged about $7,200 gross per month for the previous 12 months. The matter was then continued by mutual agreement a number of times over the next year.[1] By July 2000 Victor stipulated to produce a number of documents, including title to all vehicles he owned, his bank records from 1998 to the present, and his state and federal tax returns for 1997-1998.

Victor did not produce the documents, Pamela did not bring any discovery motions, and the OSC went to hearing in October 2000. Pamela's most recently filed income and expense declaration showed net monthly disposable income of about $4,200; she was grossing an average of $8,600 over the previous 12 months. Victor filed his income and expense declaration the day of the hearing. His "I & E" showed net disposable income of about $2,000, current net disposable income of about $2,300, and total gross salary or wages of some $68,000 over the previous 12 months, which averaged out to a monthly gross of less than $5,700.

There were a total of five exhibits: (1) a packet of photos showing Victor with different cars, including a Suburban he would later testify was his

---

[1]While this pace seems somewhat leisurely, we think trial counsel—particularly trial counsel for Pamela who was usually the one acquiescing to the continuance requests—deserve kudos for professional courtesy. (See *Pham v. Nguyen* (1997) 54 Cal.App.4th 11, 17 [62 Cal.Rptr.2d 422] ["When opposing counsel needs a continuance, courts should look to [Code of Civil Procedure] section 595.2 as a statement of policy in favor of professional courtesy, not churlishness."].)

girlfriend's, and a BMW; (2) a packet of photos showing where Victor lived (an $800,000 house in South Orange County owned by his girlfriend); (3), (4) tax returns for 1993 and 1994 showing income of $243,450 and § 284,332 respectively; and (5) a printout obtained over the Internet from the National Association of Securities Dealers indicating he was currently working at a firm known as Western Securities.

The only witness was Victor himself. Victor testified he owned a 91 BMW, worth about $9,000-$10,000 and a "race car" described as a "1964 buggy kit car Volkswagen base car." He had been living with his girlfriend for four years. Her cousin owned a boat, Victor believed that she made $3,000 or $4,000 a month when they had previously worked together at a savings and loan, and the document from the securities dealers association was inaccurate: The Securities Exchange Commission and the National Association of Securities Dealers had closed Victor's old firm down two months previously, and Victor ended up on the list from Western Securities when he applied for employment there. Because Victor couldn't transfer his license from one firm to another, he was unable to find employment as an investment advisor and had started a new business selling race car parts, which allowed him to make $2,000 to $3,000 a month net.

In closing argument, Pamela's trial attorney argued that it was "inconceivable" that one could "duplicate" Victor's "lifestyle . . . for a sum less than $400,000 per annum." Her attorney also explicitly argued (apparently unaware of *In re Marriage of Wood* (1995) 37 Cal.App.4th 1059 [44 Cal.Rptr.2d 236], about which more anon) that Victor's "significant other or live-in should be looked at as well."

The trial judge disregarded the 1993 and 1994 income tax returns (because the OSC was to modify a 1997 order), did *not* find that Victor had an income of $200,000, but that, "considering the standard of living, as per the evidence," he had a monthly income of $9,000. The court determined that Pamela's net disposable income was $3,158. Plugging Victor's "nontaxable" $9,000 and Pamela's $3,158 into the dissomaster plus an 80-20 percent custodial time division yielded a child support order of $3,639. From that order Victor has timely appealed.

### III. DISCUSSION

#### A. *The Order Cannot Be Sustained as a Discovery Sanction*

Before we can address Victor's main contention—that the evidence was insufficient to sustain the finding concerning his income—we must

address the predominant subtext of the case, i.e., that this order is, deep down, really only a discovery sanction directed at Victor for not turning over the documents called for in the July 2000 stipulation. Adherents of the "realistic" school of jurisprudence are likely to surmise that the $9,000 income figure was the functional equivalent of an "issue" sanction on the question of Victor's income.

The salient fact is, however, that Pamela never made any motions to compel the production of those documents. As far as the record discloses, the sum total of her discovery efforts was to obtain the July 2000 stipulation.

Victor may have been, as litigators sometimes say, "dirty" concerning the requested documents. No doubt, had Pamela brought a motion to compel, it would have been granted, and Victor hit with sanctions for his recalcitrance. Nothing we say in this opinion is meant to countenance Victor's failure to honor the stipulation. Even so, the legal fundamentals must be observed.

The Family Code has an entire article whose purpose it is to facilitate the "inexpensive discovery of facts" before the commencement of a child support modification proceeding. (See Fam. Code, § 3660.)[2] Once a year one parent may, without leave of court, serve a request on the other parent for the production of a completed current income and expense declaration, which includes attachment of *income tax forms*. (§§ 3664, subds. (a) & (b), 3665, subd. (a).) The underlying idea is obviously to expedite the basic information necessary to the calculation of statewide uniform guideline amounts for purposes of modification orders. (Cf. *In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 316-317 [96 Cal.Rptr.2d 772] [child support statutes permit no alternative to actually calculating the guideline amount].)

In enacting this expedited discovery scheme, however, the Legislature did not obviate the traditional requirements of civil practice that discovery requests must be enforced. In fact, section 3666 specifically makes the usual practices of civil discovery applicable to the enforcement of expedited family law discovery.[3] Moreover, if a party submits an income and expense declaration that is incomplete, inaccurate, or even "missing the prior year's

[2]All statutory references not otherwise specified are to the Family Code.

[3]Section 3666 provides in its entirety: "This article may be enforced in the manner specified in Sections 1991 [disobedience to subpoenas may be punished by contempt], 1991.1 [witness disobedience to deposition subpoena may be punished by contempt], 1991.2 [section 2034 of Code of Civil Procedure applicable to enforcement proceedings under section 1991], 1992 [witnesses can be fined and liable for disobedience to subpoenas], and 1993 [bench warrants may be issued to compel witness attendance] of the Code of Civil Procedure and in the Civil Discovery Act of 1986 (Article 3 (commencing with Section 2016) of Chapter 3 of

federal and state personal income tax returns," the party may be ordered to pay "all costs of the [subsequent] motion" as sanctions. (§ 3667.)[4]

Pamela thus had the tools to readily obtain all the necessary information, including his 1997-1998 income tax returns, from Victor. She could have brought a motion to compel documents (see Code Civ. Proc., § 2031) and, if Victor remained obstinate, obtained any number of sanction orders, including an "issue sanction," an "evidence sanction," or a monetary sanction. (Code Civ. Proc., § 2031, subd. (n).)[5]

Had Pamela formally obtained an "issue sanction" order regarding Victor's income, today's result might be different. However, in the face of the Legislature's having provided a clear method of relief for Victor's failure to turn over current income tax returns, and Pamela's not having availed herself of it, we cannot justify the order before us as a de facto discovery sanction.

Of course, by the same token, on remand our opinion is obviously without prejudice to Pamela bringing whatever future motions to compel are necessary to obtain Victor's tax returns. Our opinion is also without prejudice to Pamela as to any attorney fee requests that she may bring because Victor's failure to turn over his tax returns has dramatically increased the cost of her modification proceeding, including this appeal.

B. *This Is Neither a Capacity Nor an Asset Case*

Two minor subtexts must be briefly addressed as well. First, this is not an "earning capacity" case and the order cannot be justified on that basis either. (Cf. § 4058, subd. (b); e.g., *In re Marriage of Hinman* (1997) 55 Cal.App.4th 988, 994-1001 [64 Cal.Rptr.2d 383].) There was no evidence that Victor had quit his job, rather than having been laid off, that he could have found more remunerative employment in his old profession as a stockbroker, or even that he could have made any more money in his current occupation selling race car parts.

Nor is this an "asset" case. That is, Pamela has not argued Victor's income is artificially low, but he owns assets that should be used for support. (E.g.,

Title 3 of Part 4 of the Code of Civil Procedure), and any other statutes applicable to the enforcement of procedures for discovery."

[4]We would add that the general grant of sanction power under section 271 to award attorney fees based on "the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation" is an additional deterrent to hiding one's tax returns.

[5]Code of Civil Procedure section 2031, subdivision (n) also mentions "a terminating sanction" for failure to obey an order compelling a document inspection. In the context of a child support modification proceeding where the court *must* calculate the guideline amount, it is difficult to envisage what a "terminating" sanction would look like. A default proceeding? We may leave the question for another day.

*County of Kern v. Castle* (1999) 75 Cal.App.4th 1442 [89 Cal.Rptr.2d 874] [million-dollar inheritance including $240,000 lump sum, while not income, still had to be considered in setting support level].) She presented no evidence, for example, that Victor's girlfriend is holding assets in trust for him, or that he has any interest at all in items of property that ostensibly belong to her. (Under the facts as they are before us in this record, she could kick him out tomorrow.) We need only note that, given the elementary distinction between assets and income,[6] any attempt to proceed to make a child support order based on assets still requires, under section 4056, the calculation of the guideline amount using the respective parents' incomes—after which the support level could then be adjusted *upward* to reflect the assets. (See §§ 4056, 4057, subd. (b)(5) [court can vary guideline when application of formula would be unjust].)

C. *Income Tax Returns Are Presumptively Correct as to a Parent's Income in a Child Support Proceeding*

■ A parent's gross income, as stated under penalty of perjury on recent tax returns, should be presumptively correct. (See *In re Marriage of Scheppers* (2000) 86 Cal.App.4th 646, 650 [103 Cal.Rptr.2d 529] ["Although federal law is not conclusive on the interpretation of section 4058, it is persuasive . . . ."].) Returns are, after all, ultimately enforced by federal and state criminal penalties. Hence it is not surprising that tax returns are the core component of determinations under the guideline formula.

To calculate the guideline, the court must ascertain the variable "TN," which means the "total net monthly disposable income of both parties." (§ 4055, subd. (b)(1)(E).) The definition of "net disposable income" in section 4055, subdivision (b)(2) directs the reader to section 4059. Section 4059, in turn, defines "annual net disposable income" by deducting from "gross income" certain amounts. And section 4058 defines "gross income" with language that was "lifted straight from the definition of income in section 61 of the Internal Revenue Code." (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 529 [70 Cal.Rptr.2d 488].)

The statutory tie to actual tax returns is underscored by the requirement in section 4059 that state and federal income tax liability for purposes of computing a parent's net income must "bear an accurate relationship to the tax status of the parties." Section 4059 further specifies that the after-tax

---

[6]A distinction, however, that can be rather tricky in certain kinds of (usually fortuitous) circumstances, such as the acquisition of stock options. For a thoughtful and well-researched discussion of the issues attendant to the receipt of such options, see *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269 [92 Cal.App.4th 1016h, 111 Cal.Rptr.2d 755].

income of the parent must be based on state and federal income taxes "actually payable (not necessarily current withholding)."

In more commonsense terms, the use of income as stated on a tax return accords with the Legislature's goal of uniformity and expedition. Section 4050 refers, after all, to a "statewide uniform" guideline, and determining income by using tax returns has the advantage of not only being relatively easy, but, as we have just said, enforced by federal and state civil and criminal penalties. It also spares chronically overcrowded family courts the burden of determining income on an ad hoc basis, with the risk of inconsistent results.

There is only one *statutory* exception to the tax model of income that one finds in section 4058. Subdivision (b) specifically allows a court to use earning capacity "in lieu of the parent's income."

Accordingly, much of the jurisprudence governing determination of income has followed, or been consistent with, basic income tax law principles. That is, if one knew the tax law, one could predict whether a given item would, or would not, be included in section 4058 income for purposes of the guideline calculation. (E.g., *In re Marriage of Cheriton, supra,* 92 Cal.App.4th 269 [proceeds from sale of stock acquired by stock options should have been included as income]; *In re Marriage of Scheppers, supra,* 86 Cal.App.4th 646, 649-651 [life insurance proceeds received upon death of eldest child *not* income because, among other reasons, such proceeds are not income under Internal Revenue Code and are not derived from labor, business or property]; *County of Kern v. Castle, supra,* 75 Cal.App.4th 1442, 1453-1454 [one-time inheritance was not income, though income it could generate if invested could be considered income]; *In re Marriage of Rocha* (1998) 68 Cal.App.4th 514, 516-517 [80 Cal.Rptr.2d 376] [proceeds from a student loan not income because of expectation of repayment]; *In re Marriage of Schulze, supra,* 60 Cal.App.4th at pp. 529-530 [car and rent subsidy were income because they were employer provided].) In fact, as the *Scheppers* court has noted, even cases holding that lottery and gambling winnings are income for child support purposes are consistent with income tax law; such winnings are, after all, essentially a return on the investment of capital. (See *Scheppers, supra,* 86 Cal.App.4th at p. 651.)

D. *Cases Involving Significant Nontaxable Benefits*
*Should Be Dealt with Under Section 4057, Which Governs*
*Special Circumstances, Not as Section 4058 Income*

Two cases, however, have departed altogether from an income tax model of section 4058 income with regard to certain free housing benefits. (See

*Stewart v. Gomez* (1996) 47 Cal.App.4th 1748, 1754-1755 [55 Cal.Rptr.2d 531] [holding that free housing afforded disabled carpenter on Indian reservation was income]; *County of Kern v. Castle, supra,* 75 Cal.App.4th at p. 1451 [following *Stewart* to hold that obligor parent's "mortgage-free housing" could be considered income].) The theory, first articulated in the *Stewart* case and simply followed in *Castle,* was that the obligor parent was the recipient of a benefit that otherwise reduced his living expenses.

To the degree that these cases stand for a blanket "anything that reduces living expenses" approach to section 4058 income, we respectfully decline to follow them. In the first place, such an approach creates serious anomalies when one realizes that the most common instances of "things that reduce living expense" are new mate or nonmarital partner income, items which the Legislature has specifically forbidden, in section 4057.5, to be taken into account in "determining or modifying" child support. (See generally *In re Marriage of Wood, supra,* 37 Cal.App.4th 1059, 1065.)

Indeed, the facts of the *Stewart* and *Wood* cases juxtapose rather uneasily against each other to illustrate the sort of anomaly that the *Stewart* approach creates. In *Stewart,* a disabled carpenter who had his children 45 percent of the time and was trying to rehabilitate himself in a vocational rehabilitation program was living, rent free, on an Indian reservation. Yet the reasonable monthly value of his Indian reservation housing benefit was included as section 4058 income based on an it-reduces-living-expenses theory. Effectively, that meant that the support order was based on money that the disabled carpenter did not have.

In *Wood,* by contrast, an unemployed woman was living very well, thanks to the talents of her new husband, a successful business turn-around artist. Yet because of the strictures of section 4057.5, precluding consideration of new mate or nonmarital partner income in determining or modifying support, the trial court erred by, in substance, taking that income into consideration under the guise of "lifestyle." (See *In re Marriage of Wood, supra,* 37 Cal.App.4th at pp. 1066, 1071.)

Indeed, when *Castle* is read side by side with *Wood,* the anomalies created by the *Stewart* approach to income become even more painful. In *Castle,* a large inheritance from the obligor parent's mother allowed him to pay off his mortgage. The *Castle* court, expressly following *Stewart,* said it was permissible for the trial court to consider "as income the mortgage-free housing" the obligor parent was now living in. (*County of Kern v. Castle, supra,* 75 Cal.App.4th at p. 1451.) Thus, if the *Stewart* approach is followed, we are left with this rule: If you move in with your new spouse or nonmarital

partner in a home that reflects the new spouse's or partner's income, the court cannot consider the value of the housing to be imputed income; but if your parents let you move in with them, it can.

In the second place, *Stewart*'s theory of income contravenes the established interpretory rule of *expressio unius est exclusio alterius.* The *Stewart* opinion cited subdivision (a)(3) of section 4058 as authority for including the free Indian reservation housing as income. (*Stewart v. Gomez, supra,* 47 Cal.App.4th at p. 1755.) But the actual text of subdivision (a)(3) confines benefits that result in a "corresponding reduction in living expenses" to "employee benefits or self-employment benefits." Having expressly mentioned the "corresponding reduction in living expense" idea *only* in the context of employee or self-employment benefits, the natural inference is that the Legislature didn't want trial courts bogged down in benefit debates *outside* of that context.[7]

Finally, and most basically, the Stewart *approach* is out of step with the basic flow of the child support statutes. As we have demonstrated, the Legislature has set up a system where tax return income can presumptively (and, despite the complications of the actual formula in § 4055, rather easily) be used to "compute" net disposable income. The advantage of computing net disposable income first is that the trial court then has a relatively accurate idea of the cash flow available to each parent. (The Legislature has thus provided a built-in safeguard: where child support orders bear little relation to disposable income, the trial court must at least confront that fact.) Then, if there are circumstances making the application of the guideline formula unjust or inappropriate (and that could include a formula result that might arguably be too low), the Legislature has provided an appropriate escape valve in sections 4056 and 4057: The trial court can make an order varying the formula—but it must do so with reasons stated on the record.

If, for example, in *Stewart* or *Castle,* the housing situation of one parent might have meant that application of the formula amount would have been inappropriate or unjust (and there is no question, given the facts in *Castle,* that it was), the proper course was to first calculate the guideline amount in light of the parents' incomes as revealed by such evidence as tax returns, income and expense declarations and pay stubs, and then, under section 4057, to adjust the amount upward in light of the free housing benefit. Such an approach respects the rebuttable correctness of the mechanically calculated guideline amount, and allows child support awards to properly reflect

---

[7]The *Stewart* court did not consider this point. To the degree that it addressed the problem that the Indian reservation housing was not an employee benefit it merely said, "We see no reason to distinguish an employee housing benefit from an Indian reservation housing benefit." (*Stewart v. Gomez, supra,* 47 Cal.App.4th at p. 1755.)

the parents' standard of living without doing violence to the word "income" in a way that would make the Sheriff of Nottingham proud.[8]

### E. *In the Present Case, Was Insufficient Evidence to Make This Order Modifying Child Support*

On occasion, of course, the IRS has asserted that a taxpayer's "lifestyle" belies his or her *reported* income, and the agency has sought penalties because of it. The theory is that the taxpayer is just plain breaking the law and not reporting income under section 61 of the Internal Revenue Code. (E.g., *United States v. Gellman* (11th Cir. 1982) 677 F.2d 65 [burden on United States to prove that taxpayer wilfully did not file returns where prosecution was based in part on lifestyle evidence].) But there are established ways the IRS goes about computing income based on the contention that a taxpayer's manner of living is inconsistent with his or her reported income. (E.g., *In re Rigney* (Bankr.N.D.Ala. 1997) 216 B.R. 65.) For example, the IRS can examine a personal bank account to see where the money for the various withdrawals is coming from. (See *id.* at p. 66.) And we have no doubt the expert testimony of a forensic accountant could serve in a child support case to establish that a parent's true income under the tax laws was not reflected on his or her tax returns.

In the present case, however, Pamela did not try to establish that Victor's income was other than his tax return income or his income and expense declaration by such means. Instead, she relied on the legal equivalent of "dead reckoning." A few photos of an ex-spouse with assets owned by the ex-spouse's new spouse or "nonmarital partner" would not be sufficient in tax court and they are not sufficient here. In the absence of tax returns, the only evidence as to Victor's income was his own testimony and his income and expense declaration.

Neither supports the order made here. Indeed, just "eyeballing" the respective net disposable income of the parties under the only evidence of income that was adduced, it would appear that any modification should have been downward. Our opinion is, of course, without prejudice to either party in future proceedings.

---

[8]If the *Castle* and *Stewart* approaches were taken to their logical conclusion, there would be no end to litigation, and a relatively automatic computerized process would become bogged down in numerous problems of where to draw the line between things that "reduce living expenses" and things that merely make life better. Discount coupons received in the mail, free or discounted tickets to entertainment events from coworkers who suddenly found they couldn't go, or even the value of an employer's contribution to Social Security might be characterized as "income." George Harrison once satirized such a mindset when he wrote about a hypothetical greedy tax collector, "If you drive a car . . . , I'll tax the street . . . If you take a walk . . . I'll tax your feet." (George Harrison, "Taxman.")

### F. *The Trial Court Also Erred in Taking Victor's Nonmarital Partner's Income Into Account Under the Guise of "Lifestyle"*

Apparently unaware of *In re Marriage of Wood, supra,* 37 Cal.App.4th 1059, Pamela's trial counsel asked the court to take into account Victor's standard of living as made possible by the largesse of his girlfriend. The trial court followed suit, and explicitly took that standard of living into account in making its order.

As the court pointed out in *Wood,* new partner or spouse income is one thing family law courts have been "specifically forbidden," by section 4057.5, to look at. (*In re Marriage of Wood, supra,* 37 Cal.App.4th at p. 1069.) Nor can such income be looked at under the "guise of lifestyle." (*Id.* at p. 1071.) The lifestyle theory is "tantamount to considering new mate income." (*Id.* at p. 1066.) The trial court's error is thus plain.

We need only add that *Wood's* reading of section 4057.5 is rooted in the text of that statute, which precludes the use of the "obligor parent's subsequent spouse or nonmarital partner" income in "determining or modifying" child support. "Determining or modifying" are broad words in this statutory context. That is, they go beyond mere calculation of the guideline amount. If the Legislature had wanted to exclude new spouse or nonmarital partner income from merely the calculation of the guideline amount, it would have used the word "compute," as it did in section 4059.

### IV. CONCLUSION

The order is reversed. There was no evidence on which to make a support order based on $9,000 of imputed "nontaxable" income to Victor. We need not deal with any issue of retroactivity here, because there is no evidence in the record that what Victor was paying under the 1997 dissolution judgment was below the statewide uniform guideline.

However, even though the order before us must be reversed, a few more comments are in order for the benefit of the court in any further proceedings. (See Code Civ. Proc., § 43.)

First, this trip to the appellate court was at least in part occasioned by Victor's failure to provide his 1997-1998 income tax returns as well as Pamela's failure to compel their production. In any future proceedings in the wake of today's opinion, the trial court may take into account, in assessing attorney fees, Victor's conduct in not providing his tax returns. (§ 271.)

Second, we are not saying that a parent may never prove income that was either nonreported or underreported on the other parent's tax returns by

means of lifestyle evidence—at least when lifestyle evidence is not based on new spouse or nonmarital partner income. (See § 4057.5.) If the IRS can do it, a parent should be able to do it. But we are saying that to do so will take a more detailed showing than was made here.

Finally, given that Victor's hands are not exactly spotless, we exercise our discretion to award costs in the interests of justice. Even though Victor has prevailed in this appeal, each party shall bear his or her own costs.

Bedsworth, J., and Moore, J., concurred.