Filed 6/7/16  Marriage of Rubanowitz CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re the Marriage of BARBRA and SHALOM RUBANOWITZ. _____ <br><br> BARBRA RUBANOWITZ, <br><br> Appellant, <br><br> v. <br><br> SHALOM RUBANOWITZ, <br><br> Respondent. | B257782 <br><br> (Los Angeles County Super. Ct. No. BD574834) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce G. Iwasaki, Judge.  Reversed and remanded.

Honey Kessler Amado for Appellant.

Law Offices of Schuchman & Aldin, Tina S. Schuchman and Raymond Hekmat; and Edward J. Horowitz for Respondent.

_____

Appellant Barbra Rubanowitz appeals from the trial court's orders for pendente lite child support, spousal support, and attorney's fees in this marital dissolution action between Barbra and her former husband, respondent Shalom Rubanowitz.[1]  During the pendency of the action, the trial court ordered Shalom to pay Barbra $1,500 per month in child support, ordered Barbra to pay Shalom's counsel $140,000 in attorney's fees and costs, and denied each party's request for spousal support.  On appeal, Barbra argues that the trial court erred in considering the monetary payments that Barbra's father made either directly to her or to third parties on her behalf as income attributable to Barbra for the purpose of determining support and attorney's fees.  We reverse and remand the matter for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     The Marital Dissolution Proceeding

Barbra and Shalom were married in 1991.  They separated on September 24, 2012, and Barbra filed a petition for dissolution of the marriage on December 10, 2012.  They have seven children, six of whom were minors when the dissolution proceeding began.  Shalom is an attorney and operates his own law practice.  Barbra is a stay-at-home mother.  During the marriage, Barbra and Shalom agreed that Barbra would not work outside of the home and instead would be responsible for raising the children and caring for their daily needs.  As a result, Shalom was the principal source of income for the family and paid for nearly all of the family's expenses in the years preceding the separation.  However, after Barbra filed the petition for dissolution, Shalom did not agree to provide her with any child or spousal support.

In January 2013, during the pendency of the action, Barbra filed a request for orders concerning child custody, child support, and spousal support.  With respect to support, Barbra sought child support for the six minor children based on the statutory

---

[1]     As is customary in dissolution proceedings, we refer to the parties by their given names for clarity of reference, and not out of disrespect.  (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 46, fn. 1.)

2

child support guidelines and spousal support in the amount of $17,675 per month.  In April 2014, Shalom filed a response to Barbra's request.  In his response, Shalom asked the trial court to deny Barbra's request for spousal support, to impute the money that Barbra had received from her family as income to Barbra for the purpose of calculating child support and spousal support, to order Barbra to pay Shalom's attorney's fees in the amount of $250,000 under Family Code section 2030, and to order Barbra to pay Shalom's attorney's fees as a sanction under Family Code section 271.  The matter was heard by the trial court in May 2014.

## II.     Shalom's Income and Expenses

As of the May 2014 hearing, Shalom had been a practicing attorney for more than 15 years.  He was the sole owner of a law practice specializing in bankruptcy and real estate, and he engaged in title litigation throughout the Western United States.  Shalom's revenue from his law practice dropped dramatically in 2011 when he lost a major client, and as a result, he did not receive any salary in 2012 or 2013.  Shalom stated that he was attempting to rebuild his law practice, but he recently had suffered from health-related issues that impeded his ability to develop new business.  In addition to his law practice, Shalom was a rabbi and received a parsonage allowance for his services.

Prior to the sale of the family residence in March 2014, Shalom paid the monthly mortgage owed on the property.  In accordance with a stipulation between the parties, Shalom and Barbra each received an advance of $100,000 of the net proceeds from the sale.  A total of $196,780 of the proceeds was distributed to Shalom's current and former attorneys pursuant to family law attorney real property (FLARP) liens recorded on the residence.  The remaining net sale proceeds were deposited into interest-bearing blocked accounts, and as of April 2014, Shalom's account held approximately $270,000.

In an April 2014 income and expense declaration, Shalom indicated that his total monthly income from his law practice and parsonage allowance was $4,306, and that his total monthly expenses were $18,485.  His claimed monthly expenses included $5,000 in rent, $400 in clothes, $300 in entertainment, and $600 for a housekeeper.  Shalom stated

that he currently was paying for these expenses by incurring credit card debt and using the $100,000 advance from the sale of the family residence. Shalom also had received an $110,000 loan from his parents, but had not repaid any portion of that loan. As of April 2014, Shalom had paid his current attorney, Tina Schuchman, a total of $160,000, consisting of $150,000 from the sale of the family residence pursuant to the FLARP lien and $10,000 in personal savings. Shalom stated that, once these funds were depleted, he would be unable to pay his attorney's fees because of the aggressive manner in which Barbra was litigating the action.

In determining Shalom's gross adjusted income available for support, Shalom's forensic accountant, Jack White, proposed that income from a one-year time period in 2013 be used. Under White's proposed calculation, Shalom's monthly gross adjusted income based on distributions from his law practice in 2013 was $8,360. In contrast, Barbra's forensic accountant, Tracy Katz, proposed that a time period of at least three years be used to determine Shalom's available income. Under Katz's proposed calculation, Shalom's monthly gross adjusted income based on distributions in 2011, 2012, and 2013 was $17,435.

### III.    Barbra's Income and Expenses

Following the parties' separation, Barbra's father, William Moskovits, began providing Barbra with large sums of money to pay for the living expenses of Barbra and the children, as well as Barbra's attorney's fees and litigation costs. Between March 2012 and December 2013, Moskovits wrote 29 checks to Barbra totaling $1,015,702. Of these 29 checks, 27 were paid in 2013. According to Barbra's forensic accountant, Katz, the average amount that Moskovits paid directly to Barbra was $39,065 per month.[2]   In

---

[2]     In calculating this figure, Katz divided $1,015,702 (the total amount paid directly to Barbra) by 26 months (the number of months between November 2011 and December 2013), even though none of the payments to Barbra were made in 2011 and only two of the payments were made in 2012. Katz indicated that, if a 24-month period covering January 2012 to December 2013 was used instead, the average amount that Moskovits paid directly to Barbra was $42,321 per month.

addition to these direct payments to Barbra, between November 2011 and December 2013, Moskovits wrote checks to third party vendors on behalf of Barbra and the children totaling $442,103. These third party payments covered, among other expenses, the cost of the minor children's private school tuition, extracurricular activities, and therapy. According to Katz, the average amount that Moskovits paid to third parties on behalf of Barbra and the children was $17,004 per month.

In a May 2014 income and expense declaration, Barbra stated that she had no income and that her total monthly expenses were $30,317. Barbra's claimed expenses included $5,200 in rent, $1,800 in therapy for Barbra, and $11,800 in education, extracurricular activities, and therapy for the minor children. The private school tuition for each child was $12,000 to $14,000 per year. Barbra stated that she currently was paying for these expenses with "various loans" from Moskovits, which totaled $1,844,501. She also stated that she intended to repay a portion of the loans with the $100,000 advance that she had received from the sale of the family residence. As of May 2014, Barbra had paid her attorney $423,772 through the funds provided by Moskovits, and still owed an additional $18,634 in attorney's fees.

At a deposition, Moskovits testified that he gave Barbra money on a regular basis and provided her with a check once or twice a month to pay for her and the children's living expenses, including rent. He also paid for all of Barbra's attorney's fees and costs. Moskovits stated that, if Shalom was not ordered to pay the amounts sought by Barbra, he would continue to provide her with financial support, but would not do so at the same level. Moskovits explained that, once the divorce proceedings concluded, he anticipated that Barbra's expenses would be much lower because she would no longer be incurring attorney's fees and other litigation costs. Moskovits also stated that, if Barbra was unable to repay all of the money he had provided to her, he would "probably wait until she wins the lottery" because there was "[n]othing else [he] could do." Barbra admitted that she only "sometimes" reviewed the bills from her attorney, and that she never questioned those bills.

5

Shalom's forensic accountant, White, proposed that the total amount of payments made by Moskovits to or on behalf of Barbra be considered income to Barbra for the purpose of determining support. Under White's proposed calculation, Barbra's monthly gross adjusted income was $60,582. On the other hand, Barbra's forensic accountant, Katz, proposed that none of the payments made by Moskovits to or on behalf of Barbra be considered income because these funds were necessary to pay for Barbra's and the children's living expenses. Under Katz's proposed calculation, Barbra's monthly gross adjusted income was $0.

## IV. The Trial Court's Orders for Pendente Lite Support and Attorney's Fees

On May 29, 2014, following a two-day hearing, the trial court issued a written order on the parties' requests for child support, spousal support, and/or attorney's fees. The trial court made the following findings and orders:

### A. Shalom's Income

The trial court adopted a two-year time period between January 2012 and December 2013 to determine Shalom's monthly gross income available for support. The court also adopted the distribution figures proposed by Barbra's forensic accountant to calculate Shalom's gross adjusted income based on the average distributions from his law practice in 2012 and 2013. Applying this approach, the court found that Shalom's gross income available for support was $11,098 per month.

### B. Barbra's Income

The trial court found that the monetary payments that Moskovits made to and on behalf of Barbra were gifts rather than loans. The court noted that, although Barbra had signed two promissory notes totaling over $375,000, there was no repayment date, interest rate, or security interest identified in the notes, and Moskovits had testified that he did not realistically expect to be repaid. The court also found that the payments made by Moskovits, including the payments to third parties, were regular and recurring cash gifts to Barbra, and as such, they could be treated as income to Barbra for the purpose of

6

calculating both child and spousal support. The court rejected Barbra's argument that the payments to third parties could not be considered income, and explained that "[t]o hold otherwise would provide an easy loophole that would not be in the best interest of the supported children and run contrary to legislative intent."

The trial court further found that Barbra "has received and can expect to receive no less than $57,000 per month" from Moskovits, and that even if the entirety of Shalom's gross monthly income were used to pay child and spousal support, Moskovits "would continue to pay [Barbra] most of what he has been paying." The court thus found that, since the separation date, Moskovits had not been providing financial support to Barbra in lieu of support from Shalom, and that Moskovits "would be generously paying expenses for his daughter and grandchildren in any case." For purposes of determining child and spousal support, the court found that Barbra's gross income available for support was $30,000 per month. The court noted that this amount was "about half of what [Barbra] actually receives, but is discounted because [Moskovits] may reduce his payments some if [Shalom] paid more."

### C.    Child Support Order

The trial court used the DissoMaster program to calculate the statutory guideline amount of child support based on a gross income of $11,098 per month for Shalom and $30,000 per month for Barbra. The total guideline amount of child support was calculated to be $424 per month for the five minor children, payable from Shalom to Barbra.[3] The court decided, however, to adjust upward from the guideline amount because Shalom's income and expense declaration showed that he was spending generously on himself. The court found that a substantial portion of the money that Shalom was using for his personal expenses would be better spent on the children. The court ordered Shalom to pay child support to Barbra in the amount of $1,500 per month.

---

[3]    One of the children turned 18 years old while Barbra's request for child support was pending before the trial court.

### D. Spousal Support Order

The trial court also used the DissoMaster program to calculate a guideline amount of temporary spousal support based on a gross income of $11,098 per month for Shalom and $30,000 per month for Barbra. The guideline amount of spousal support was calculated to be $5,791 per month, payable from Barbra to Shalom. The court decided to depart from the guideline amount based on a finding that Moskovits would curtail his payments to Barbra if a portion was being used to pay spousal support to Shalom, which would be detrimental to the children. The court found that it was in the best interest of the children that neither party pay the other spousal support pending trial. The court therefore denied each party's request for temporary spousal support.

### E. Attorney's Fee and Cost Award

In assessing the relative circumstances of the parties for purposes of determining an attorney's fee and cost award, the trial court noted that Moskovits had been paying all of Barbra's attorney's fees and costs, and that Barbra barely reviewed her attorney's bills. The court also noted that a blocked account containing $400,000 in net proceeds from the sale of the family residence would be available to Barbra to contribute to the payment of attorney's fees. The court found that there was a substantial disparity in access to funds to retain and maintain counsel, and that Barbra had the ability to pay Shalom's attorney's fees. The court also found that Shalom's request for attorney's fees was reasonable based on the estimates provided by his counsel regarding the additional work to be performed in the action. The court ordered Barbra to pay Shalom's counsel a total of $140,000 in attorney's fees and costs under Family Code section 2030, payable in three monthly installments. The court denied Shalom's request for attorney's fees under Family Code section 271 without prejudice to the matter being presented at trial.

## V. Notice of Appeal

On June 13, 2014, Barbra filed written objections to the trial court's findings and orders. On July 23, 2014, the trial court overruled Barbra's objections in their entirety on

8

the ground that they were an improper attempt to reargue the merits.  Barbra thereafter filed a timely notice of appeal from the trial court's orders.

## DISCUSSION

On appeal, Barbra argues that the trial court abused its discretion in making the May 29, 2014 orders concerning child support, spousal support, and attorney's fees.  Barbra specifically asserts that the trial court erred in treating the monetary payments made by Moskovits as income attributable to Barbra for the purposes of determining pendente lite child support, spousal support, and attorney's fees.

### I.      Standard of Review

An award of child support, spousal support, or attorney's fees in a pending marital dissolution action generally is reviewed on appeal for an abuse of discretion.  (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 753 [child support]; *In re Marriage of MacManus* (2010) 182 Cal.App.4th 330, 337 [spousal support]; *In re Marriage of M.A. & M.A.* (2015) 234 Cal.App.4th 894, 903 [attorney's fees].)  In applying this standard of review, "[w]e determine 'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' [Citation.]  We do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order.  [Citation.]" (*In re Marriage of Schlafly*, *supra,* at p. 753.)  In reviewing a child support order, however, "'we are mindful that "determination of a child support obligation is a highly regulated area of the law, and the only discretion a trial court possesses is the discretion provided by statute or rule." [Citation.]' [Citation.]" (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1312.)  "To decide whether the trial court followed established legal principles and correctly interpreted the child support statutes, we apply the independent standard of review.  [Citation.]" (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 731 (*Alter*).)

9

## II.    Child Support

In California, statutory guidelines govern the determination of child support. (Fam. Code,[4] § 4050 et seq.)  "[A]dherence to the guidelines is mandatory, and the trial court may not depart from them except in the special circumstances enumerated in the statutes. [Citations.]" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 284.) Section 4055 sets forth a mathematical formula for computing the guideline amount of child support based on the relative income of the parents and their time-sharing arrangement for physical responsibility of the children.  (§ 4005.)  "The guideline amount of child support . . . is presumptively correct. [Citation.]" (*In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1359.)  However, under section 4057, the presumption may be rebutted by "admissible evidence showing that application of the formula would be unjust or inappropriate in the particular case."  (§ 4057, subd. (b).)

"The mandatory formula for calculating child support takes into account both parents' 'net monthly disposable income' [citation], which is determined based upon the parents' 'annual gross income' …." (*Alter*, *supra*, 171 Cal.App.4th at p. 731.)  "Parental income is 'broadly defined' for the purpose of calculating child support under the statutory guidelines.  [Citation.]" (*In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1237.)  "Section 4058, subdivision (a), defines 'annual gross income' as 'income from whatever source derived,' and lists more than a dozen possible income sources to be considered as part of annual gross income." (*Alter*, *supra*, at p. 731, fn. omitted.)  "'By the statute's express terms, that list is not exhaustive.  [Citations.] Rather, the codified income items 'are *by way of illustration* only. Income from other sources … should properly be factored into the 'annual gross income' computation.  [Citations.]" [Citation.]' [Citation.]" (*In re Marriage of Williams*, *supra*, at p. 1237.)  A number of California cases have considered whether nontaxable benefits provided to a parent by a

---

**4**      All further statutory references are to the Family Code.

third party may be treated as income to the parent for the purpose of calculating child support.

For instance, *In Re Marriage of Loh* (2001) 93 Cal.App.4th 325 (*Loh*) addressed whether evidence of a parent's lavish lifestyle could be used to impute income to the parent under section 4058. The mother in *Loh* sought an upward modification of a child support order against the father by presenting a series of photographs showing the father enjoying an expensive lifestyle with his girlfriend. The trial court found the father had nontaxable income of $9,000 based on such evidence and ordered an increase in his child support obligation. (*Id*. at p. 327.) The court of appeal reversed the order, concluding the lifestyle evidence offered by the mother was insufficient to support the modification. (*Id*. at pp. 336-337.) The court rejected a blanket rule that would treat any benefit reducing a parent's living expenses as income under section 4058. Instead, the court concluded that a parent's gross income, as stated on his or her tax returns, was presumptively correct for the purpose of computing the guideline amount of child support, and that nontaxable benefits received by the parent, such as rent-free housing, should be treated as a special circumstance supporting an adjustment to the guideline amount under section 4057. (*Id*. at pp. 332-335.) The court reasoned that "such an approach respects the rebuttable correctness of the mechanically calculated guideline amount, and allows child support awards to properly reflect the parents' standard of living. . . ." (*Id*. at pp. 335-336; see also *In re Marriage of Williamson*, *supra*, 226 Cal.App.4th at p. 1315 [trial court did not err in refusing to impute value of rent-free housing provided by father's parents as income to father where parents regularly stayed in home and housing benefit increased amount of father's income available for support]; *In re Marriage of Schlafly*, *supra*, 149 Cal.App.4th at pp. 758-759 [adopting *Loh* approach to conclude that value of father's mortgage-free housing was not includable as income under section 4058, but may be special circumstance under section 4057 justifying deviation from guideline amount].)

Subsequently, the decision in *Alter* addressed whether cash gifts provided to a parent by a third party could be considered income to the parent under section 4058.

11

(*Alter*, *supra*, 171 Cal.App.4th 718.) In *Alter*, the father's mother provided substantial financial support to the family during the marriage. After the separation, the father received $6,000 every month from his mother, including $3,000 to pay for rent, which he claimed was either a loan or a gift and not income for the purpose of calculating child support. In computing the guideline amount of child support, the trial court treated these $6,000 monthly payments as nontaxable income to the father under section 4058. (*Id*. at pp. 724-726.) The court of appeal upheld the child support order, concluding that the payments were gifts rather than loans because there was no evidence that the father had ever repaid any of the money given. (*Id*. at p. 731.) The court further concluded that the regular and recurrent nature of the payments meant that the money was available to the father for child support and could be properly considered part of his income under section 4058. (*Id*. at p. 731.) As the court explained, "section 4058 defines 'annual gross income' as 'income from whatever source derived.' This definition is broad enough to encompass gifts that bear a reasonable relationship to the traditional concept of income as a recurrent, monetary benefit. It is irrelevant that there is no legal obligation on the part of the donor to continue making the gifts or that the flow of cash does not appear on the income tax return. [¶] . . . Therefore, the question of whether gifts should be considered income for purposes of the child support calculation is one that must be left to the discretion of the trial court." (*Id*. at pp. 736-737.)

The court in *Alter* distinguished *Loh* and other cases adopting a strict tax-model approach to the definition of income on the basis that those decisions concerned non-cash benefits for which "the court must make ad hoc determinates of the value," whereas "cash gifts are readily valued." (*Alter*, *supra*, 171 Cal.App.4th at p. 733.) The *Alter* court also noted that "ignoring gifts that form a part of the parent's regular cash flow would give an unrealistic picture of the parent's ability to pay," and that "even if recent tax returns set forth the presumptively correct amount of income, the presumption could be rebutted by evidence of recurring gifts of money that form a regular part of the parent's income picture." (*Id*. at pp. 734-735.) In response to the father's argument that the $3000 per month that he received from his mother for rent could only be used as a

12

special circumstance to adjust the guideline amount under section 4057, the *Alter* court stated: "Although the [trial] court might have proceeded that way, it was not necessary to have done so. If [the father] had only the benefit of rent-free living, valuing the benefit and including it as part of the income calculation could give an inaccurate picture of his cash flow situation and, in that situation, it would have been inappropriate to characterize the value of the benefit as income. . . . But here, [the father's] mother did not simply give him the benefit of living in the home; she gave him the money to pay for it. Thus, the benefit was easily valued and represented part of [the father's] monthly cash flow." (*Id.* at p. 737; see also *In re Marriage of Williamson*, *supra*, 226 Cal.App.4th at p. 1315 [trial court did not err when it included the annual cash gifts that father was receiving from his parents as income for purposes of calculating child support, but excluded as income the parents' historical periodic cash advances to father which had ceased before trial].)

In this case, the trial court designated the sum of $30,000, approximately one-half of the computed average of the monthly payments made by Moskovits to or on behalf of Barbra, as the gross monthly income available to Barbra for purposes of child support. After computing the statutory guideline amount of child support based on this income figure, the court then adjusted upward from the guideline amount of $424 per month to order Shalom to pay Barbra child support of $1,500 per month. The court stated that it was departing from the guideline amount because there was a significant discrepancy between Shalom's claimed income and expenses, and a substantial portion of the money that Shalom was spending on his personal expenses would be better spent on the children.

We consider whether the trial court abused its discretion in determining that the payments made by Moskovits, whether directly to Barbra or to third parties on her behalf, met the definition of "income" under section 4058. We conclude that the trial court abused its discretion in determining that Moskovits's *direct* payments to Barbra were

13

income within the meaning of the statute.[5]  There was substantial evidence to support the trial court's finding that the payments were gifts rather than loans; as of the May 2014 hearing, Barbra had not repaid any portion of the money provided, and Moskovits stated that he did not realistically expect to ever be repaid.  There was also substantial evidence to support the trial court's finding that the payments made directly to Barbra were gifts that formed part of Barbra's monthly cash flow for purposes of child support.  Moskovits testified that he intended to continue providing Barbra with financial support in the future (albeit at a lower level once she was no longer incurring significant attorney's fees and costs).  Contrary to Barbra's contention on appeal, the fact that Moskovits had no legal obligation to continue making these payments is not determinative of whether they could be properly characterized as income.

However, the evidence does not support the trial court's conclusion that the payments met the standard prescribed by *Alter*.  Instead, the record shows a great deal of variability, consistent with Moskovits's testimony that he made payments to Barbra when she asked:  $5,000 in December 2012 (one check), $0 in January 2013, $100,000 in February 2013 (two checks), $100,000 in March 2013 (two checks), $50,000 in April 2013 (one check), $250,000 in May 2013 (three checks), $110,000 in June 2013 (one check), $130,000 in July 2013 (two checks), $15,000 in August 2013 (one check),

---

**5**      The parties do not urge this court, on appeal, to consider whether *Alter* was correctly decided.  We are cognizant of the need for stability and certainty for the parties and the trial courts in making the difficult and necessary decisions allocating responsibility for support among families in dissolution proceedings, and are mindful of the strict guidelines set by the Legislature in these cases.  We note, however, that *Alter* and its progeny are in some ways inconsistent with economic reality.  For example, the common understanding by individuals of the term "income" does not usually include gifts, whether recurrent in nature or not.  The distinction between cash and non-cash benefits also ignores the reality that many non-cash benefits in today's economy are readily valued and capable of certain analysis.  Finally, providing a special definition of income for purposes of section 4058 may not be critical, in light of the court's ability to make adjustments to the ultimate award in light of section 4057.  These issues, while not necessary to this court's determination of the issues on appeal, may nonetheless be worthy of attention by other courts, the Supreme Court, and the Legislature.

14

$60,000 in September 2013 (two checks), $86,987 in October 2013 (five checks), $37,665 in November 2013 (five checks), and $70,000 in December 2013 (three checks). The number of payments varied each month, as did the amounts of the checks: eight checks for $50,000, two checks for $15,000, two checks for $4,000, and one check each for $5,000, $150,000, $110,000, $80,000, $45,000, $14,000, $9,956, $27,000, $26,000, $10,031, $16,665, $3,000, $10,000, $22,000, $6,000, and $42,000. The record is inconsistent with a conclusion that these payments were periodic and regular in the way described by the *Alter* court.

We conclude, in addition, that Moskovits's *indirect* payments to third party vendors were not a regular part of Barbra's monthly cash flow for purposes of the *Alter* analysis, and thus, these payments should not have been treated as income to Barbra under section 4058. While some of these third party payments, such as the private school tuition for the children, were regularly made in predictable fixed amounts, other payments were sporadic in nature, varied in amount, and depended on what particular expenses were incurred in a given month. On balance, these third party payments were irregular and outside "the traditional concept of income as a recurrent, monetary benefit." (*Alter*, *supra*, 171 Cal.App.4th at p. 736; see also *M.S. v. O.S.* (2009) 176 Cal.App.4th 548, 560-561 [Indian tribe's payment of father's attorney's fees to his attorney was not income under section 4058 because "if [father] incurs no fees he gets no benefit," and hence, the payments were "not part of [his] regular income"].)

The trial court further abused its discretion in concluding that, of the approximately $57,000 per month paid by Moskovits (consisting of about $40,000 per month directly to Barbra and $17,000 per month to third parties) it believed was income, only $30,000 per month should be attributed as gross income to Barbra in calculating the guideline amount of child support. On appeal, Barbra argues that the designation of $30,000 as her gross monthly income was arbitrary, and thus, inconsistent with the statutory guidelines for determining child support. We agree. Although the Family Code allows for certain deviations from the uniform child support guideline, a trial court lacks discretion to depart from the guideline amount of support until that amount is precisely

15

and accurately calculated. "Consistent with Family Code sections 4055 and 4056, deviations cannot be justified simply by making an estimate. . . . If the trial court is going to use its discretion to vary the guideline amount, it must make an accurate computation of that amount, then actually use its discretion and state reasons for the variance on the record, not just 'estimate' the guideline amount. . . ." (*In re Marriage of Whealon* (1997) 53 Cal.App.4th 132, 145.) Here, the trial court estimated that Barbra's gross monthly income was about half of the computed average amount that Moskovits paid each month either directly to Barbra or to third parties on her behalf. The trial court made this estimate by applying a discount to the actual payments made by Moskovits, reasoning that Moskovits "may reduce his payments some if [Shalom] paid more." However, the trial court did not explain which payments were discounted to arrive at the $30,000 per month in gross income attributable to Barbra, or how any such determination of the amounts to be discounted was made. Because it appears the $30,000 figure was arbitrarily selected, the trial court erred in calculating the guideline amount of child support by relying on a rough estimate of Barbra's gross monthly income available for support. On remand, the trial court must determine what amounts, if any, should be attributed to Barbra as income, and use those amounts to calculate the guideline. To the extent the trial court determines adjustment to the guideline amount is appropriate under section 4057, it should delineate those amounts.

### III.    Spousal Support

Temporary spousal support is governed by section 3600, which states, in pertinent part, that [d]uring the pendency of any proceeding for dissolution of marriage . . . , the court may order . . . either spouse to pay any amount that is necessary for the support of the other spouse. . . ." (§ 3600.) "Awards of temporary spousal support rest within the broad discretion of the trial court and may be ordered in 'any amount' [citation] subject only to the moving party's needs and the other party's ability to pay. [Citation.] Permanent support, by contrast, is constrained by numerous statutory factors set out in section 4320. [Citations.]" (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581,

16

595-596, fn. omitted.) "'""Whereas permanent spousal support 'provide[s]' financial assistance, if appropriate, as determined by the financial circumstances of the parties after their dissolution and the division of their community property,' temporary spousal support 'is utilized to maintain the living conditions and standards of the parties in as close to the status quo position as possible pending trial and the division of their assets and obligations.' [Citations.]" [Citation.] The court is not restricted by any set of statutory guidelines in fixing a temporary spousal support amount. [Citation.]' [Citation.]" (*In re Marriage of Tong and Samson* (2011) 197 Cal.App.4th 23, 29.) "Rather, in exercising its broad discretion, the court may properly consider the 'big picture' concerning the parties' assets and income available for support in light of the marriage standard of living. [Citation.]" (*In re Marriage of Wittgrove* (2004) 120 Cal.App.4th 1317, 1327.)

*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225 (*Shaughnessy*) addressed whether monetary gifts to a spouse may be considered in determining a spousal support award. In *Shaughnessy*, the trial court ordered a reduction in a former husband's permanent spousal support obligation based, in part, on a finding that his former wife was receiving $20,000 per year from her parents. (*Id*. at p. 1234.) The court of appeal affirmed the order, concluding the trial court did not abuse its discretion in considering the monetary gifts from the wife's parents in modifying the husband's spousal support obligation. (*Id*. at pp. 1231.) Citing analogous case law in the child support context, the court reasoned that "[i]f a trial court has the authority to consider gifts made to a spouse in determining *child* support, it follows that a trial court may consider gifts when exercising its broader discretion in fashioning an award of *spousal* support." (*Id*. at p. 1243.) The court cautioned, however, that it was not holding "the trial court *must* mechanically decrease a supported spouse's award by the amount of any gifts received, or even that the trial court *should* in every case consider such gifts in determining the appropriate level of support." (*Id*. at pp. 1243-1244.) Rather, the court held that "it is within the trial court's broad discretion to consider evidence of monetary gifts as one factor . . . in determining the appropriate spousal support award." *(Id.* at

17

p. 1244; see also *In re Marriage of Stanton* (2010) 190 Cal.App.4th 547, 551 [nontaxable benefits received by spouse, such as military allowances for housing and food, may be considered as part of spouse's income for purpose of calculating temporary spousal support].)

Here, Barbra contends that the trial court abused its discretion when it considered Moskovits's monetary gifts in deciding whether to order temporary spousal support. Barbra specifically claims that, by considering both the direct and indirect payments made by Moskovits in determining the appropriate level of spousal support, the trial court "created an order for monies that Barbra simply does not have." In support of this claim, Barbra notes that the trial court used the DissoMaster program to calculate a guideline amount of spousal support, which resulted in a guideline amount of $5,761 per month, payable from Barbra to Shalom. However, this was not the order made by the court. After calculating the guideline amount of support based on a gross monthly income of $30,000 attributable to Barbra, the trial court decided to depart from the guideline amount given the likelihood that Moskovits would curtail his monetary gifts to Barbra if a portion of those funds had to be used to pay spousal support to Shalom. The trial court accordingly ordered that neither party pay the other temporary spousal support.

As Barbra acknowledges, a trial court is permitted to rely on computer-generated guidelines in determining temporary spousal support, and is not restricted by any set of statutory guidelines in fixing the amount of temporary spousal support to be awarded. (*In re Marriage of Wittgrove*, *supra*, 120 Cal.App.4th at pp. 1327-1328.) The problem in this case, however, as explained above, is that the trial court's determination of Barbra's income is not supported by the record. On remand, the trial court must reconsider the spousal support order in light of appropriate income determinations.

## IV. Attorney's Fees and Costs

An award of pendente lite attorney's fees or costs in a marital dissolution action is governed by sections 2030 and 2032. Section 2030 requires the trial court to "ensure that each party has access to legal representation . . . to preserve each party's rights by

18

ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (§ 2030, subd. (a)(1).) Section 2032 provides that the trial court may award fees or costs under section 2030 "where the making of the award, and the amount of the award, are just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) The factors to be considered in determining the relative circumstances of the parties include, to the extent relevant, those enumerated in section 4320 for determining spousal support, including the catchall "[a]ny other factors the court determines are just and equitable." (§ 4320, subd. (n); see § 2032, subd. (b).) Payment of a fee or cost award under section 2030 may be ordered "from any type of property, whether community or separate, principal or income." (§ 2032, subd. (c).)

When a request for attorney's fees is made under section 2030, the trial court must "make findings on whether an award of attorney's fees . . . is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees. . . ." (§ 2030, subd. (a)(2).) The decision to award attorney's fees under section 2030 "is left to the court's sound discretion." (*In re Marriage of M.A.*, *supra*, 234 Cal.App.4th at p. 903.)

The recent decision in *In re Marriage of Smith* (2015) 242 Cal.App.4th 529 (*Smith*) addressed whether a court could consider monetary gifts received by a spouse in determining the relative circumstances of the parties for the purpose of awarding attorney's fees under section 2030. In *Smith*, a former wife's father had paid all of her attorney's fees in a pending marital dissolution action, which totaled more than $300,000, and testified that he intended to continue financing his daughter's litigation efforts and did not expect to be repaid. The trial court considered the funds paid by the father to the wife's attorneys in deciding to award attorney's fees and costs to the former husband. (*Id*. at pp. 531-532.) The court of appeal affirmed the order, concluding that the trial court did not abuse its discretion in considering the father's "regular, substantial infusions

19

of cash as part of its determination of the relative circumstances of the respective parties and their ability to maintain or defend the proceedings." (*Id*. at p. 534.)  In response to the wife's argument that she did not have access to her father's wealth for the purpose of paying anyone else's attorney's fees, the court reasoned that "[t]his circumstance . . . does not distinguish the funds [the wife] received from her father from any other source of income:  '"Few, if any, sources of income are certain to continue unchanged year in and year out. …" … [¶] … It is irrelevant that there is no legal obligation on the part of the donor to continue making the gifts… .' [Citation.]" (*Id*. at p. 535.)  The court therefore concluded that  "[t]he trial court acted within its discretion by rejecting [the wife's] plea of poverty for purposes of apportioning the overall cost of the litigation equitably between the parties." (*Ibid*.; see also *Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 647 [trial court did not abuse its discretion in considering a party's receipt of regular, recurrent monetary gifts from her father in determining her need for attorney's fees].)

In this case, Barbra argues that the trial court abused its discretion in ordering her to pay Shalom's attorney's fees because there was no showing that Barbra had the ability to pay any portion of the fee award given that she had no earned income.  We disagree; the trial court had discretion to consider the substantial payments that Moskovits made to and on behalf of Barbra in determining the relevant circumstances of the parties and their ability to pay attorney's fees.  In addition to the monetary gifts made directly to Barbra to support her and the children's lifestyle, Moskovits had paid all of the attorney's fees and costs incurred by Barbra in litigating the dissolution action, which totaled between $400,000 and $1 million as of the May 2014 hearing.  Notwithstanding the substantial fees incurred, Barbra admitted that she only "sometimes" reviewed the bills from her attorneys.  As the *Smith* court observed, "to conclude the trial court was required to exclude those funds from consideration would vitiate one of the primary purposes of section 2030 and section 2032, to prevent one party from being able to 'litigate[] [the opposing party] out of the case,' by taking advantage of their disparate financial circumstances.  [Citation.]" (*Smith*, *supra*, 242 Cal.App.4th at p. 535.)  On this record,

20

the trial court reasonably determined that it was just and reasonable to consider the payments made by Moskovits as part of the parties' relative economic circumstances.

The decision in *In re Marriage of Schultz* (1997) 60 Cal.App.4th 519 (*Schultz*) does not compel a different conclusion. In *Schultz*, the trial court ordered a non-custodial father to pay his former wife's attorney's fees in the amount of $7,500, "payable in full 'forthwith.'" (*Id.* at p. 530.) The court of appeal concluded that amount of the award was appropriate given the relative circumstances of the parties, but that the provision for full and immediate payment was based on an erroneous presumption that the father could obtain the money from his parents because they previously "had lent him about $8,000 to pay his own fees." (*Id.* at p. 531.) In reversing the attorney's fee award, the court noted that "[c]harity, once extended, is still not an entitlement." (*Id.* at p. 532.) However, *Schultz* involved a relatively small, one-time loan by the father's parents. In contrast, a parent's "regular, substantial infusions of cash" may properly be considered as part of the relative circumstances of the parties for the purpose of determining an attorney's fee or cost award. (*Smith*, *supra*, 242 Cal.App.4th at p. 534.)

However, because the record demonstrates that the payments made to Barbra were not regular and recurring, and because the trial court appeared to rely on those payments without consideration of the other factors delineated by sections 2030 and 2032, it must reconsider the role of the payments made by Moskovits as part of its review of the statutory factors. In addition, the record reflects that the trial court erred in calculating the amount of attorney's fees and costs to be awarded to Shalom based on his respective need. The court ordered Barbra to pay directly to Shalom's counsel a total of $140,000, payable in three monthly installments. According to an April 2014 declaration from Shalom's counsel, this was the amount in attorney's fees and costs that Shalom was likely to incur in litigating the dissolution action going forward. The trial court found that this estimate of the work to be performed by Shalom's counsel in the future was reasonable, and Barbra does not challenge that finding on appeal. However, Shalom's counsel also stated in her declaration that Shalom already had paid her firm the sum of $160,000 (which included $150,000 in a client trust account pursuant to a FLARP lien on

21

the family residence), and that Shalom had incurred a total of $81,413.31 in attorney's fees as of March 31, 2014. Accordingly, as of that date, a balance of $78,586.69 remained in the client trust account held by Shalom's counsel, which presumably would be used to pay a portion of the $140,000 in attorney's fees and costs that the trial court found Shalom was likely to incur through trial.[6]

Under these circumstances, the trial court's order that Barbra pay $140,000 in attorney's fees and costs to Shalom's counsel exceeded the amount reasonably necessary for Shalom to maintain the dissolution action during the pendency of the proceeding. We therefore reverse the trial court's award of pendente lite attorney's fees and costs, and remand the matter to the trial court to reconsider Shalom's request for attorney's fees and costs under section 2030. On remand, the trial court shall consider its redetermination of Barbra's income and the balance of funds remaining in the client trust account held by Shalom's counsel, as well as the attorney's fees and costs likely to be incurred by Shalom through trial, in deciding whether to order an award of attorney's fees and costs to Shalom under section 2030, and if so, the amount of such award.

---

[6] Barbra asserts that Shalom did not have any need for an attorney's fee award because he had access to an additional $270,000 in a blocked account from the sale of the family residence. However, section 2032 specifically provides that "[t]he fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested. Financial resources are only one factor for the court to consider in determining how to apportion the overall cost of the litigation equitably between the parties under their relative circumstances." (§ 2032, subd. (b).) The fact that Shalom had additional funds outside the client trust account held by his attorney did not preclude the trial court from finding that there was a substantial disparity between the parties in their respective access to funds to maintain counsel.

## DISPOSITION

The trial court's May 29, 2014 orders are reversed and the matter is remanded for further proceedings consistent with this opinion.  Barbra shall recover her costs on appeal.

ZELON, Acting P. J.

We concur:

SEGAL, J.

BLUMENFELD, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.