[No. G045142. Fourth Dist., Div. Three. Oct. 22, 2012.]

In re the Marriage of JEFFREY and ANDREA BARTH.
JEFFREY BARTH, Appellant, v.
ANDREA BARTH, Respondent;
ORANGE COUNTY DEPARTMENT OF CHILD SUPPORT SERVICES,
Intervener and Respondent.

## COUNSEL

Law Offices of William J. Kopeny and William J. Kopeny for Appellant.

Law Offices of Michel & Rhyne, Michael L. Michel and Karen Rhyne for Respondent.

Kamala D. Harris, Attorney General, Julie Weng-Gutierrez, Assistant Attorney General, Linda M. Gonzalez and Mary Dahlberg, Deputy Attorneys General, for Intervener and Respondent.

## OPINION

**MOORE, Acting P. J.**—If ever there was a case where the adage "be careful what you wish for"[1] applied, this is surely it. Appellant Jeffrey Barth spent years resisting Andrea Barth's[2] attempt to litigate their divorce and child custody issues in Ohio, going as far as appealing to the Ohio Supreme Court. That court agreed with Jeffrey and concluded the Ohio courts lacked jurisdiction because Andrea had not lived in Ohio for six months immediately prior to filing her divorce action. (*Barth v. Barth* (2007) 113 Ohio St. 3d 27 [2007 Ohio 973, 862 N.E.2d 496, 498].) Jeffrey finally achieved what he wanted—the case was back in California. Ultimately, the trial court, pursuant to Family Code section 4009,[3] granted Andrea's request for child support retroactive to the date Jeffrey had originally filed his California divorce action, with credit given for the amounts Jeffrey paid under the now void Ohio order. The support Jeffrey was ordered to pay was significantly higher than the amount the Ohio trial court had ordered.

Jeffrey offers a number of arguments to support his claim that the trial court abused its discretion by awarding retroactive child support. He claims the court erroneously applied section 4009 retroactively, asserting, among

---

[1] See, e.g., Jacobs, Aesop's Fables (2001) <http://bartleby.com/br/01701.html> (as of Oct. 22, 2012). The fable "The Old Man and Death" concludes with the line: " 'We would often be sorry if our wishes were gratified.' " (Capitalization omitted.)

[2] We subsequently refer to the parties by their first names for the ease of the reader. No disrespect is intended. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475–476, fn. 1 [274 Cal.Rptr. 911].)

[3] Subsequent statutory references are to the Family Code unless otherwise indicated.

other things, that doing so constituted an equal protection violation. Jeffrey also argues the court erred by imputing income to him after it concluded that he had done everything possible to hide and minimize his income in order to shrink his child support obligations. As we shall discuss below, Jeffrey's equal protection argument lacks merit, and he has failed to establish an abuse of discretion on any other point. We therefore affirm.

## I

## FACTS

Jeffrey and Andrea married in 1989 and had two children, born in October 1994 and October 1996.[4] Prior to 2004, the family lived in Westlake, Ohio, where Andrea was employed by a pharmaceutical company while Jeffrey worked as a certified public account (CPA). In February 2004, Jeffrey accepted a job working as director of internal audit for a manufacturing company in California. He moved to Orange County and rented a house while Andrea and the children remained behind for several months. In July, Andrea and the children arrived in California and joined Jeffrey. Approximately six weeks later, in August, Jeffrey admitted to extramarital affairs. Within two days, Andrea and the children returned to Ohio. On August 24, Andrea filed for dissolution in Ohio, while Jeffrey filed in Orange County on August 25.

Jeffrey also filed an order to show cause (OSC) seeking return of the children to California. Andrea appeared and opposed the motion. At or prior to the hearing on Jeffrey's OSC, the hearing officers conducted a discussion pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (§ 3400 et seq.). The California case was stayed pending the Ohio proceedings.

Litigation proceeded in Ohio for the next 31 months. Jeffrey continued to object that the Ohio court lacked jurisdiction. In Jeffrey's motion to dismiss before the Ohio magistrate, he claimed Andrea's removal of the children from California back to Ohio was "misconduct." The magistrate found these allegations to be "brazen and not founded in the facts of the case." The magistrate also concluded that had Andrea known of Jeffrey's extramarital affairs, "she would not have surrendered her job, sold the marital home and moved her children to California . . . ." The magistrate denied Jeffrey's motion and concluded the Ohio courts had jurisdiction.

---

[4] Jeffrey's counsel is reminded that citations to the record must cite "to the volume and *page number* of the record where the matter appears." (Cal. Rules of Court, rule 8.204 (a)(1)(C), italics added.) Citing to a tab in the appendix that includes an entire document, which may include 40 pages or more, is insufficient.

Early in 2005, Jeffrey moved to the Newport Coast area and rented a townhouse. He was promoted to vice-president of finance for a subsidiary of the employer for which he had moved to California. Jeffrey also began a regular pattern of travel between California and Ohio to spend time with the children. In February 2007, Jeffrey was terminated, receiving 20 weeks of additional salary and a pending bonus. He also received $187,500 as a partial settlement from a stock option program.

Afterward, Jeffrey commenced self-employment, setting up businesses in California and Ohio and maintaining residences in both states. In July 2007 he formed a California professional partnership known as Channels & Barth, LLP. In January 2008, Jeffrey formed JA Barth, LLC, a California company providing tax and accounting services. In Ohio, Jeffrey started two businesses: Audit Pro, LLC, providing audit and related services, and Ohio Tax Debt Solutions. Jeffrey traveled back and forth between California and Ohio for a number of reasons, including the ongoing Ohio family law case, his Ohio business interests, and spending time with the children. At some point, Jeffrey's mother purchased a house just a few doors away from Andrea, which was partially funded by Jeffrey. Jeffrey lived in that house when he was in Ohio.

In due course, the Ohio court made findings and entered child support orders. Child support was set at $1,295 per month, retroactive to November 2004, later increased to $1,600 per month. The Ohio support orders were never registered in California.

Jeffrey appealed and lost, but the case found its way to the Ohio Supreme Court, with Jeffrey again arguing the Ohio courts lacked jurisdiction. In March 2007, Jeffrey prevailed, as the court concluded the relevant Ohio statute created a strict test of residency. Jeffrey's purported fraud in inducing Andrea to California was therefore irrelevant because Andrea's 40-day stay in California terminated her previous residency, which began anew when she returned to Ohio. (*Barth v. Barth, supra*, 862 N.E.2d at pp. 499–500.) The judgment was reversed, and accordingly, the Ohio trial court dismissed Andrea's complaint and vacated any and all previous judgments and orders.

In April 2007, Jeffrey filed an OSC in Orange County, seeking to lift the stay and obtain child support orders. Commissioner Thomas Schulte did so, and made a number of inquiries. On June 8, Jeffrey sought Andrea's default, which was entered and from which she was later relieved. In August, Jeffrey applied for a fee waiver on the basis of a sworn affidavit claiming in forma pauperis, which the court granted.

That same month, Andrea filed an OSC to establish child support, and the court set a hearing for September. Andrea also issued subpoenas to obtain

records from Jeffrey's former employer and his bank. Jeffrey, who was self-represented by this point, filed a motion to quash the subpoenas and sought a protective order. He also asked the court to reconsider its ruling setting aside Andrea's default. At a September hearing, Commissioner Schulte denied Jeffrey's motion, established a parenting plan and directed an evaluation under Evidence Code section 730. Jeffrey then filed a challenge against Commissioner Schulte under Code of Civil Procedure section 170.1, which was denied by the supervising judge.

In Jeffrey's response to Andrea's OSC, he cited to the Ohio proceedings, pointing out that Ohio never had subject matter jurisdiction, and all Ohio orders issued along the way were void from the beginning. Around this time, the Orange County local child support agency intervened and, for that reason, Commissioner Schulte transferred Andrea's OSC to Child Support Commissioner Craig Arthur.

Commissioner Arthur continued the child support hearing to May 2008 and several more continuances followed before the hearing began in January 2009. Jeffrey objected to the commissioner sitting as a temporary judge pursuant to section 4251, subdivision (c), but the hearing went forward with Commissioner Arthur sitting as a referee empowered to recommend findings and orders. Andrea and the local child support agency presented their case, while Jeffrey presented no evidence and rested.

On May 5, 2009, Commissioner Arthur issued recommended findings and rulings, which we need not review in much detail here. Suffice it to say that Commissioner Arthur found retroactive child support appropriate, and set guideline support ranging from $2,253 per month to $7,239 per month from October 2004 to December 2007. The court also made findings as to Jeffrey's and Andrea's incomes and child custody timeshare during that period, with Jeffrey's timeshare ranging from 10 percent in 2004 to 30 percent in 2007.

With regard to future support, Commissioner Arthur noted that Jeffrey had lost his job in February 2007 because of his visitation schedule, as he was spending 11 days per month with the children in Ohio. The commissioner noted that Jeffrey had started his own accounting businesses, with clients in California, Ohio, and elsewhere. He accepted Jeffrey's representation that his income was less than $36,000 in 2007, with $32,000 to $42,000 estimated in 2008 and $45,000 to $60,000 projected for 2009. Based primarily on Jeffrey's representations regarding his income and his conclusion that Jeffrey's extended time in Ohio was in the best interests of the children, Commissioner Arthur declined to impute income to Jeffrey and set zero child support effective January 2008.

Jeffrey filed an objection to the recommendations pursuant to section 4251 and demanded a de novo hearing before a judge. The case was then transferred to Judge Waltz, who issued the order that is the subject of the instant appeal. The court conducted a hearing on the child support issues and, in February 2011, issued a detailed written order with findings of fact and conclusions of law. As it relates to this appeal, the court found that setting child support retroactively to the date of Jeffrey's initial complaint was appropriate, and the court imputed income to Jeffrey for the years 2008 and 2009 at $10,000 per month.

There is simply no way to sugar-coat the extent to which the court concluded that Jeffrey lacked all credibility when it came to reporting financial matters. "The court carefully watched and listened to Petitioner's trial testimony on direct examination, cross-examination and when responding to the court's questions. Over time the court lost confidence in Petitioner's ability or willingness to tell the truth." The court believed Jeffrey was "being purposefully vague and evasive."

With respect to his in forma pauperis declarations in 2007, filed under penalty of perjury, the court concluded Jeffrey "egregiously misrepresented material facts and information." As the court pointed out, while Jeffrey "claimed a de minimus amount of money in the bank (compare: 2006 earnings were over $773,000) and no recurring income compared to monthly living expenses between $7,165 and $9,200 per month. Compare: between 2004 and through 2007 Petitioner earned wages and salaries of $1,599,164. In 2006 alone Petitioner earned $773,463." Further, Jeffrey had failed to disclose both his "substantial severance package" with his former employer or "recurring rental income from his Newport Coast townhouse." In 2007, the same year he filed the in forma pauperis declarations under penalty of perjury, he "earned taxable income of $316,271."

The court also concluded that Jeffrey's 2008 and 2009 income and expense declarations included "false statements and material omissions," including his living expenses, which Jeffrey purposely understated "to match his professed modest monthly self-employment income of $1,250 per month." These amounts were not trivial; Jeffrey claimed his living expenses were $2,675 per month (in 2008) and $2,400 per month (in 2009), while the court estimated them between $7,000 and $9,000.

Jeffrey's misstatements included representing the rental expense of his Newport Coast townhome as $1,100 per month, when in fact it was $3,100 per month. Jeffrey also "falsely declared that no one was contributing to the payment of his monthly living expenses when in fact Petitioner engaged in a regular practice of sub-renting the townhouse and not reporting that income,

estimated to be $1,500 per month." In 2009, he also failed to disclose $31,500 in income he received from his former employer. The court concluded that Jeffrey's tax returns also failed to reflect this income.

The court noted that Jeffrey had submitted voluminous trial exhibits, including financial reports, all prepared by him in contemplation of trial. "[T]he court's confidence in the documents waned and steadily declined and finally, the court concluded that in general, the financial statements presented by Petitioner were intended to mislead, and not inform." The court noted Jeffrey's self-prepared accounting of business expenses for his California and Ohio accounting practices, which included literally dozens of expense items (including for establishments such as Pizza Hut, Sprinkles Cupcakes, Starbucks, and 7-Eleven). The court concluded Jeffrey "included dozens of personal expenses as business expenses," and "included wages he allegedly paid to his girlfriend without any satisfying evidence to justify the expense." Not surprisingly, "The court concluded many of the professed business expenses were phony or personal."

Moreover, the court found that Jeffrey's prior behavior before the Ohio courts had been just as problematic, concluding Jeffrey "grossly under-reported his actual income to the Ohio courts. [¶] . . . For instance, while Petitioner in fact earned $287,288 in 2004 and $222,000 in 2005, doubtless based on Petitioner's misrepresented income, the Ohio judge ordered Petitioner to pay a modest $1,296.00 in child support."

The court concluded that Jeffrey "is a highly educated and intelligent man, with years of financial experience and a licensed CPA in both Ohio and California. [¶] . . . However, using his professional skills, Petitioner has undertaken a course of action to understate his actual income for the purpose of skewing the court's calculation of guideline child support. [¶] . . . Based on Petitioner's multiple instances of presenting false or misleading sworn testimony, this judge has little confidence in the trustworthiness of his financial reports and oral testimony regarding his actual income, except where his testimony was independently corroborated. [¶] . . . While Petitioner's tax returns would otherwise be presumed correct, that presumption is soundly rebutted in this case. (*IRMO Loh* (2001) 93 Cal.App.4th 325, 337–338 [112 Cal.Rptr.2d 893].) Petitioner's 2008 and 2009 tax returns substantially understate his actual gross income. [¶] . . . [¶] Petitioner has purposefully understated his living expenses to match his professed de minimis self-employment income, for the purpose of skirting his obligation to pay guideline child support. [¶] . . . To the extent Petitioner's self-employment income is accurately reported, a conclusion this Court rejects, then Petitioner is woefully and purposefully under employed, based on his age, education, work experience, and earning history and a lifestyle that includes homes and

businesses in Ohio and California. [¶] . . . Petitioner has misrepresented his housing circumstances in Ohio, and in fact he is living rent-free in a home owned by his mother. [¶] . . . Petitioner has not told the truth for the specific purpose of reducing his child support obligations."

The court then considered the vocational report prepared by Andrea's expert, Michael Bonneau. "Mr. Bonneau evaluated Petitioner and stated he has both an ability to earn and the opportunity to earn based on his age, education and work experience. Mr. Bonneau testified that there is sub-stantial evidence of a reasonable likelihood that Petitioner could, with reasonable effort, apply his education, skills and training to produce income. Mr. Bonneau's opinions were not challenged. In addition, Mr. Bonneau quantified Petitioner's earning capacity in the range of $120,000 to $150,000 annually plus bonus. Mr. Bonneau's opinions were not rebutted."

Because the court concluded that support was retroactive under section 4009, support guidelines were calculated for each year. As relevant here, the court calculated Jeffrey's income for 2008 and 2009 as "[i]ncome by imputation of income at $10,000 per month (low side of income range) plus $31,500 (other nontaxable income) from Kerr Corporation never reported on his tax return plus $18,000 rental income (other nontaxable income) never reported on his tax return."

For the entire period retroactive to Jeffrey's complaint, the court calculated Jeffrey's child support as $3,125 per month for September to December 2004, $2,762 per month for the first half of 2005, $2,742 per month for the second half of 2005, $7,645 per month for 2006, $3,343 per month for 2007, $1,748 per month for 2008, $1,921 per month for 2009, and $1,058 per month for 2010. With credit given for the $58,384 Jeffrey had paid to that point, his arrears were calculated at $171,358, and he was ordered to and deemed capable of paying $1,000 per month to satisfy that amount. Jeffrey now appeals.

## II

## DISCUSSION

### A. *Statutory Framework and Standard of Review*

■ "California has a strong public policy in favor of adequate child support. [Citations.] That policy is expressed in statutes embodying the statewide uniform child support guideline. [Citation.] 'The guideline seeks to place the interests of children as the state's top priority.' [Citation.] In setting guideline support, the courts are required to adhere to certain principles,

including these: 'A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life.' [Citation.] 'Each parent should pay for the support of the children according to his or her ability.' [Citation.] 'Children should share in the standard of living of both parents. Child support may therefore appropriately improve the standard of living of the custodial household to improve the lives of the children.' [Citation.]" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 283 [111 Cal.Rptr.2d 755], fn. omitted.)

When the trial court's findings regarding the amount of support are challenged, "an appellate court cannot interfere with the trial court order unless, as a matter of law, an abuse of discretion is shown. [Citations.] The power of the appellate court therefore begins and ends with the determination as to whether the trial court had *any* substantial evidence (whether or not contradicted) to support its conclusions. [Citation.] The appellate court should not substitute its own judgment for that of the trial court; it should determine only if any judge reasonably could have made such an order. [Citation.]" (*In re Marriage of Aylesworth* (1980) 106 Cal.App.3d 869, 876 [165 Cal.Rptr. 389]; see *In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 97 [91 Cal.Rptr.2d 374].)

## B. *Section 4009*

In 1998, former section 4009 stated: "An order for child support may be made retroactive to the date of filing the notice of motion or order to show cause, or to any subsequent date, except as provided by federal law (42 U.S.C. Sec. 666(a) (9))." (Former § 4009.) In *County of Santa Clara v. Perry* (1998) 18 Cal.4th 435 [75 Cal.Rptr.2d 738, 956 P.2d 1191] (*Perry*), the California Supreme Court interpreted section 4009 to mean that "support orders can be made retroactive only to the filing date of the notice of motion or order to show cause for support." (18 Cal.4th at p. 438.)

In 1999, the Legislature amended section 4009. It currently states:[5] "An original order for child support may be made retroactive to the date of filing the petition, complaint, or other initial pleading. If the parent ordered to pay support was not served with the petition, complaint, or other initial pleading within 90 days after filing and the court finds that the parent was not intentionally evading service, the child support order shall be effective no earlier than the date of service." (§ 4009.)

Jeffrey cites *Perry, supra,* 18 Cal.4th 435. He also cites *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039 [131 Cal.Rptr.3d 424], a case involving

---

[5] Two subsequent minor amendments were made in 2000 and 2004.

the retroactivity of a modified, rather than original, child support order. He then acknowledges the amendment to section 4009, arguing: "Appellant believes that this statute did not intend to confer jurisdiction on the California Court to award support back to 2004 where, as here, Respondent: (1) never submitted to the jurisdiction of the California Court any time before July of 2007; (2) took her children to Ohio and established an Ohio child support order *based on Ohio* law and Ohio standards of living (where the children were living the entire time); (3) actively avoided California jurisdiction for three years; and then, when the Ohio Supreme Court ruled she had not established residency to maintain her Ohio case, ran back to the California Court and filed an OSC re Child Support, seeking California Support based on California Guidelines, not just from that date forward, but retroactively back to August of 2004."

There are a number of factual inaccuracies in this statement, but we set those aside for the moment. Jeffrey offers no legal authority whatsoever to support his claim that section 4009 should not apply here. Perhaps more importantly, he seems to entirely miss the point about child support—it is intended to support the children, not to punish parents for their litigation tactics (a stone Jeffrey might want to avoid throwing, lest he hit his own glass house).

█ The plain language of section 4009 gives the trial court the legal authority to make an original order for child support "retroactive to the date of filing the petition, complaint, or other initial pleading." █ While Jeffrey is entitled to his own opinion about what the statute intended, we need not ponder the Legislature's intent when its language is clear. "Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law. [Citation.] In determining intent, we look first to the words of the statute, giving the language its usual, ordinary meaning. If there is no ambiguity in the language, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.]" (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000 [90 Cal.Rptr.2d 236, 987 P.2d 705].) Because this case fits within the statutory framework, it was not, as Jeffrey claims, "erroneous on the facts of this case" to apply section 4009, or "an abuse of discretion for the trial court to exercise its Section 4009 power in a way to reward Respondent's three year efforts to evade California jurisdiction of this case . . . ."

█ There is also not, as Jeffrey claims, any "denial of equal protection" in applying section 4009 here. Jeffrey's argument on this point insists that he is "similarly situated to a person with respect to whom a temporary support order [(i.e., the Ohio support order)] was made in California . . . ." Jeffrey is wrong. " ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the

legitimate purpose of the law receive like treatment." ' [Citation.] 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654].) "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Ibid.*)

This is not a difficult question. Jeffrey is not similarly situated to someone who was subject to a temporary support order in California for the simple reason that such an order bears no legal or factual relationship to a *permanent* support order in Ohio. Further, because the Ohio orders were entered without jurisdiction, as determined by the Ohio Supreme Court, they were void. (See *County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1225 [113 Cal.Rptr.3d 147].) From a legal standpoint, the Ohio orders never existed.

■ Thus, while Jeffrey claims it is a denial of equal protection to treat him differently than a person subject to sections 3603 and 3651, subdivision (c),[6] those sections relate to modification, not original orders.[7] The Legislature enacted different schemes relating to original orders and modification to serve different purposes, and there is simply no precedent or logical reason for treating a parent with a void, out-of-state permanent order the same as someone subject to a valid, temporary order in California. We find Jeffrey's equal protection argument devoid of merit.

Finally, in a one-paragraph argument lacking any legal authority, Jeffrey simply claims it was an abuse of discretion for the trial court to apply section 4009 in this case. He also claims the court ordered a "retroactive increase," of child support, again ignoring the void nature of all Ohio orders. An abuse of discretion is only demonstrated when no reasonable judge could have made the challenged order. (See *In re Marriage of Aylesworth, supra*, 106 Cal.App.3d 869 at p. 876.)

We find no abuse of discretion here. Indeed, the court's order was in line with exactly what Jeffrey had sought since the inception of this case—

---

[6] We presume Jeffrey intended to refer to section 3651—his citation is to section 3561, which does not exist.

[7] Section 3603 states: "An order made pursuant to this chapter may be modified or terminated at any time except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." Section 3651, subdivision (c)(1) provides: "Except as provided in paragraph (2) and subdivision (b), a support order may not be modified or terminated as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate."

jurisdiction in California, the application of California law, and the treatment of the Ohio orders as utterly void. The trial court determined that Jeffrey "failed to present satisfying and convincing evidence that there exist[s] a significant cost of living difference between Ohio and California that render[s] a California guideline child support unjust or inappropriate." Further, the court concluded that even if such a difference did exist, it was acceptable for child support to "over-satisf[y]" a child's minimum needs. We agree, and find Jeffrey has not demonstrated an abuse of discretion.

## C.   *Jeffrey's Income*

Jeffrey's next argument is that the trial court erred by imputing income to him for the years of 2008 and 2009 and "on into the future." The court's order stated that Jeffrey's income was imputed at "$10,000 per month (low side of income range) plus $31,500 (other nontaxable income) from Kerr Corporation never reported on his tax return plus $18,000 rental income (other nontaxable income) never reported on his tax return."

This issue is also reviewed for abuse of discretion. (*In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1393 [111 Cal.Rptr.2d 487].) Section 4058, in addition to setting forth how the annual gross income is calculated, also states: "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." (§ 4058, subd. (b)(3).)

Jeffrey's argument is almost entirely based on the principle that the party asking a court to impute income must demonstrate through admissible evidence that the other party has both the ability and opportunity to earn an income. (See *In re Marriage of Bardzik* (2008) 165 Cal.App.4th 1291, 1301 [83 Cal.Rptr.3d 72] (*Bardzik*).) The *Bardzik* court held that a mother's retirement prior to age 65 and evidence of her earnings before retirement was insufficient to make such a showing. (*Id.* at p. 1295.) The court also noted: "We have every confidence that trial judges can sniff out shirking and efforts to skirt legitimate obligations well enough that a per se 'last and highest income rule' is not only contrary to statute, but unwise and unnecessary as well." (*Id.* at p. 1313.)

While *Bardzik, supra,* 165 Cal.App.4th 1291, provides a solid rule of law for cases where it is applicable, this is not such a case. The court did not simply decide a range of income based on Jeffrey's last year of outside employment. While Jeffrey continues to claim he had been "[un]employed" for three years prior to the date of the hearing, the evidence showed that he was self-employed and was either substantially understating his income or was "woefully and purposefully under employed." Jeffrey does not claim

these findings were unsupported by substantial evidence, and we would find any such claim without merit if he had.

Instead, Jeffrey focuses almost entirely on the testimony of Andrea's expert, Michael Bonneau, regarding outside employment opportunities for Jeffrey. Jeffrey expends much effort to pick apart Bonneau's uncontroverted testimony, claiming that Bonneau's conclusion that he should be able to earn $120,000 to $150,000 per year was without foundation. He claims Bonneau did not, for example, know how many applicants sought each open position, and points out that Bonneau did not opine employment was *immediately* available, but might only be obtained after months of attempting to find work. Jeffrey's arguments are meritless. This is a far cry from the factual situation in *Bardzik*,[8] where the court simply imputed the mother's preretirement income as future income without further evidence. Here, Bonneau offered uncontroverted evidence that Jeffrey had the ability and opportunity to work based on his age, education, and work experience.

Jeffrey also claims that Bonneau did not consider Jeffrey's custodial situation, in which he spent 11 days a month in Ohio with the children. Bonneau was not required to determine if Jeffrey could find a job that would not require him to reevaluate the custody arrangement—custody arrangements sometimes have to adjust to meet a parent's work requirements. He was merely required to determine if the ability and opportunity to work exists. He did so, and his factual findings were supported by substantial evidence. As the trial court pointed out, Jeffrey's "lifestyle choices are of his own making." He is, after all, the parent who decided to live in California, far from his children, and has decided to continue living here despite his purported "unemployment" and California's purportedly higher cost of living.

We also conclude the amounts imputed to Jeffrey were fair and within the court's discretion. The court took the low amount suggested by Bonneau, of $10,000 a month, as well as other miscellaneous income. The court's decision was in the context of its determination that it had "lost confidence in [Jeffrey's] ability or willingness to tell the truth." The court concluded Jeffrey had falsely underrepresented his living expenses for 2008 and 2009, failed to disclose rental and other income, falsely claimed no one was contributing toward his living expenses, and underreported income on his tax returns. The court also determined that Jeffrey's financial statements were "intended to

---

[8] It is also a far cry from the other case Jeffrey cites, *In re Marriage of Mosley* (2008) 165 Cal.App.4th 1375 [82 Cal.Rptr.3d 497]. In that case, we reversed the trial court when it failed to consider an expert's evidence that the stay-at-home mother had substantial earning capacity in the context of a modification order. Contrary to Jeffrey's apparent interpretation of this case, we concluded in *Mosley* that the party seeking to impute income has no burden to demonstrate that the other party would actually have been hired for an available job. (*Id.* at p. 1391.) Such a burden would, of course, be nearly impossible to meet.

mislead, and not inform." Additionally, the court found Je'ffrey also included dozens of personal expenses as business expenses, included wages allegedly paid to his girlfriend without justification, and that many of the alleged business expenses were "phony or personal." Further, Jeffrey had "grossly under-reported his actual income to the Ohio courts." Simply put, the court found that Jeffrey was not to be believed on any issue relating to his finances, and this finding was supported by overwhelming, persuasive evidence. The court had no choice but to impute income to Jeffrey for the purpose of establishing child support, and it did so in a fair manner that was supported by the evidence. We find no abuse of discretion.

## III

## DISPOSITION

The judgment is affirmed. Andrea is entitled to her costs on appeal, and she may make any appropriate motion for attorney fees before the trial court.

Aronson, J., and Thompson, J., concurred.

A petition for a rehearing was denied November 8, 2012, and appellant's petition for review by the Supreme Court was denied January 16, 2013, S207050.