Filed 12/21/21  In re M.C. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JENNIFER W.,<br><br>    Defendant and Appellant. | G060453<br><br>(Super. Ct. No. 18DP1139)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Isabel Apkarian, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

*          *          *

M.C. was born with various drugs in her system. She was removed from Jennifer W.'s (Mother) custody when she was two days old and was later found to be a dependent of the juvenile court. The court eventually terminated reunification services for Mother and set a hearing to terminate parental rights under Welfare and Institutions Code section 366.26.[1] At that hearing, Mother argued her parental rights should remain intact under the parental-benefit exception (§ 366.26, subd. (c)(1)(B)(i)). The court found the exception did not apply and terminated parental rights. Mother appeals this decision. We affirm the order because the court did not abuse its discretion when it found termination of Mother's parental rights would not be detrimental to M.C.

I

FACTS AND PROCEDURAL HISTORY

A. *Termination of Reunification Services*

The facts below are from this court's prior opinion (*Jennifer W. v. Superior Court* (Jan. 28, 2021, G059416 [nonpub. opn.]), affirming the juvenile court's termination of Mother's reunification services:

"In October 2018, M.C. was born with amphetamine and methamphetamine in her blood system and [two days] later was taken into protective custody by the Orange County Social Services Agency (SSA). Mother admitted she 'tried' methamphetamine 'one-time' before knowing she was pregnant but otherwise denied using methamphetamine. She also provided various inconsistent explanations for the drugs in the child's body. Nine months earlier, the juvenile court detained Mother's two other children with the same father after they were found unsupervised with open wounds, severe rashes, and an infection caused by leaving the children in urine-soaked diapers.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2

"SSA filed a juvenile dependency petition based on M.C.'s positive test for methamphetamine at birth. The petition also alleged both Mother and the father had unresolved substance abuse and domestic violence issues, as well as criminal histories, and had a pending dependency case for M.C.'s [two] other siblings. Mother and the father did not contest the allegations and the juvenile court found them to be true. In its dispositional order, the court continued SSA's custody of M.C. and authorized family reunification services for both Mother and the father.

"SSA and Mother stipulated to a case plan that the juvenile court incorporated into its dispositional order. The plan stipulated Mother would have supervised visitation with the child, up to seven hours per week, and SSA had the option to liberalize visitation. Mother agreed to participate in programs on parenting education, general counseling, anger management, and substance abuse. The plan also directed Mother to participate in a '12-Step Program' for substance abuse and submit to random testing. Mother agreed to be tested through a drug patch. Under the case plan, Mother knew 'all drug [and] alcohol tests [were] to be negative' and a missed drug test would be considered a positive drug test. The court advised Mother that if she 'fail[ed] to comply with the requirements of [her] reunification case plan, the court [could] terminate reunification services and set a hearing to determine a more permanent plan for [her] child,' which included possibly terminating Mother's parental rights and ordering adoption of the child.

"Over the next 21 months, Mother maintained employment and consistently kept her supervised visits with M.C. Mother was both attentive and affectionate during these visits." (*Jennifer W. v. Superior Court*, *supra*, G059416.) We supplement the prior opinion to note that some of the visits were virtual and some were in person. SSA's visitation records show M.C. and Mother appeared to have a loving relationship. At the in-person visits, M.C. hugged and talked to Mother, and Mother attended to M.C.'s needs.

3

"On her substance abuse issue, Mother reported completing her 12-Step Program and a substance abuse program. In 2019, Mother shared with her assigned SSA senior social worker, Emmanuel Rodriguez, insight gained through her participation in services, acknowledging she had placed substance use ahead of her children's well-being. Notwithstanding, Mother regularly tested positive for drug use in both 2019 and 2020. For example, in the three months following completion of her substance abuse program in August 2019, Mother tested positive for methamphetamine four times, cocaine three times, and once claimed her testing patch fell off the day before she showed up to submit it. Mother maintained she was not using illegal substances.

"Including the above results, the record shows between April 2019 and July 2020, Mother's drug patch testing returned positive results 19 times (13 of these for methamphetamine) and negative 30 times. Additionally, there was one instance where Mother's patch was reported untestable because it had been compromised and four other instances when Mother did not show up or claimed her testing patch had fallen off. Mother's visits with her children were scheduled to become unsupervised in May 2019, but remained supervised due to her positive drug test results. The last negative drug patch test occurred in February 2020, followed by eight positive results for methamphetamine and two failures to submit patches for testing.

"Over several days beginning at the end of August 2020, the juvenile court combined the 12-month status review with the 18-month status review hearing. The court received into evidence SSA's status review reports and heard testimony from Mother and social worker Rodriguez. [¶] . . . [¶]

"The juvenile court found Mother's testimony not credible and returning M.C. to Mother's custody posed a substantial risk of detriment to the child due to Mother's ongoing substance abuse. The court noted the case started because M.C. was born with drugs in her system and found Mother's drug test results trustworthy, despite Mother's denial she was using drugs. The court terminated reunification services and set

4

a hearing to select a permanent plan for the child." (*Jennifer W. v. Superior Court*, *supra*, G059416.) Mother appealed, and this court affirmed the juvenile court's order.

## B. Termination of Parental Rights

SSA's section 366.26 reports recommended that parental rights be terminated and M.C. be freed for adoption. The reports noted that M.C.'s caregivers wanted to adopt her. She had been with them since December 2018, when she was less than two months old. Her two older siblings had also been placed with the same caregivers.[2] M.C. was "stable in her placement and [was] bonded with both of the prospective adoptive parents. The prospective adoptive family ha[d] welcomed and incorporated [M.C.] into their family life and routine, ensuring the requirements for strong attachment development [were] present."

During this period, Mother was authorized for seven hours of supervised visitation per week. She was consistent with her visitation and the visits went well. SSA reported in February 2021 that Mother had moved in with her own mother (M.C.'s grandmother) in Arizona, but she continued to drive from Arizona to California to visit M.C. The section 366.26 reports only describe two of these visits, which both occurred in May 2021. SSA's notes from these two visits show Mother taught M.C. to drink from a sippy cup and worked with her on counting and identifying colors. Mother also engaged M.C. with toys, shared snacks with her, changed her diaper, and held her. She redirected M.C. when she attempted to climb on furniture. At the end of the visits, Mother and M.C. shared smiles and hugged each other.

---

[2] Mother's parental rights for M.C.'s two older siblings were terminated in a separate dependency case. This court affirmed that order in April 2021 (*In re L.C. et al.* (April 1, 2021, G059421 [nonpub. opn.]).

The section 366.26 hearing occurred in June 2021. Mother was not present, but her attorney appeared and argued for application of the parental-benefit exception.[3] Her attorney highlighted Mother's consistent visitation with M.C. He also contended that M.C.'s enjoyment of the visits and excitement when she saw Mother showed the two shared a bond. Terminating parental rights, he asserted, would deprive M.C. of having a relationship with Mother in the future.

In its ruling, the juvenile court found Mother had regular and consistent visits with M.C. However, it determined that even if there were "a beneficial relationship between [M.C.] and her mother," there was no "compelling reason[] that terminating parental rights would be detrimental to [M.C.]" The court explained that "evidence of frequent, loving contact is not enough to establish a beneficial relationship . . . . [Mother] must also show that she occupies a parental role in the child's life[,]" which was not established by the available evidence. The court concluded M.C. was adoptable and that the parental-benefit exception did not apply. It terminated parental rights and ordered that M.C. be placed for adoption.

Mother appeals this order, arguing the juvenile court erred by failing to apply the parental-benefit exception.

II

DISCUSSION

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, [section 366.26] lists plans in order of preference and provides a detailed procedure for choosing among them. . . . According to that procedure, the court must first determine by clear and convincing evidence whether

---

[3] Her attorney represented that Mother chose not to attend the hearing because it was too emotionally taxing.

6

the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. [Citation.] As we have previously explained, '[t]he statutory exceptions merely permit the court, in *exceptional* circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631, italics added (*Caden C*).)

The parental-benefit exception, which is at issue here, "is limited in scope." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632.) To establish this exception, a parent must prove three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id.* at pp. 631, 636-637.)

Here, the juvenile court's denial of the parental-benefit exception hinged on the third element. The court found Mother had met the first element. But it concluded that even if a beneficial relationship existed between the two, termination of parental rights would not be detrimental to M.C. As such, we start our analysis with the third element of the test. Two standards of review are applied to this element. The court's findings of fact are reviewed under the substantial evidence standard. But "the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion."[4] (*Caden C.*, *supra*,11 Cal.5th at p. 640.) "An abuse of discretion is

---

[4] The first two elements of the parental-benefit exception are reviewed under the substantial evidence standard. (*In re Caden C.*, *supra*,11 Cal.5th at p. 639.)

only demonstrated when no reasonable judge could have made the challenged order." (*In re Marriage of Barth* (2012) 210 Cal.App.4th 363, 374.)

In evaluating the third element, the court "decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due* to' the child's beneficial relationship with a parent." (*Ibid.*) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.)

The parental-benefit exception is not applied liberally. "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) To depart from this legislative preference, a "'parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child.'" (*In re A.G.* (2020) 58 Cal.App.5th 973, 995.) "[T]his type of relationship typically arises from day-to-day interaction, companionship and shared experiences, and may be continued or developed by consistent and regular visitation after the child has been removed from parental custody." (*In re S.B.* (2008) 164 Cal.App.4th 289, 298-299, italics omitted.)

Here, the juvenile court acted within its discretion. M.C. was removed from Mother's custody when she was only two days old. Thus, Mother and M.C. never had the day-to-day experiences that would create the necessary parental bond. And nothing in the record convincingly shows they formed such a bond through visitation. SSA's reports indicate Mother and M.C. have a warm, loving relationship. They shared pleasant visits together and were affectionate. Mother taught M.C. various skills,

8

changed her, held her, and hugged her. While this evidence supports the establishment of an emotional bond, that alone is insufficient to warrant application of the exception. This evidence does not conclusively establish Mother occupies a *parental* role in M.C.'s life. (*In re A.G.*, *supra*, 58 Cal.App.5th at p. 995.) Put differently, nothing in the record convincingly shows M.C.'s bond with Mother is so strong that the interest in keeping it intact outweighs the benefits M.C. would obtain from adoption. As such, we cannot find the court acted unreasonably in choosing to terminate parental rights and free M.C. for adoption.

Mother compares her case to *In re Amber M.* (2002) 103 Cal.App.4th 681, but the three children in that case were substantially older than M.C. when they were removed from their mother's care. The oldest was five years old, the middle child was two and a half years old, and the youngest was seven months old. (*Id.* at p. 684.) There was also evidence the mother had an important role in their lives that would be detrimental to terminate. A psychologist testified the oldest child and the mother "shared 'a primary attachment' and a 'primary maternal relationship' and that '[i]t could be detrimental' to sever that relationship." (*Id.* at p. 689.) The middle child's therapist testified his "relationship with [the mother] was positive and very important to him." (*Id.* at pp. 689-690.) Likewise, a court appointed special advocate stated the middle child "loved and missed [the mother] and had difficulty separating from her." (*Ibid.*) Finally, the court noted the youngest child "while seemingly too young to have developed much of a relationship with [the mother], nevertheless was very strongly attached to her." (*Id.* at pp. 690-691.) Here, nothing in the record indicates M.C.'s attachment to Mother was comparable to the three children in *In re Amber M.*

The two other cases cited by Mother are also distinguishable. In those cases, there was far more evidence of a deep relationship between the parents and children that would have been detrimental to terminate. The child at issue in *In re S.B.* (2008) 164 Cal.App.4th 289, was removed from her father's custody when she was three

years old. Prior to this point, the father had been her primary caregiver for her entire life. (*Id*. at pp. 293, 298.) The child "continued to display a strong attachment to" the father after she was removed from his custody. (*Id*. at p. 298.) During visits, the child told her father she loved and missed him and that she wanted to live with him. She was unhappy when visits ended and tried to leave with her father. (*Ibid*.)

In the other case, *In re Scott B.* (2010) 188 Cal.App.4th 452, 471, the child "was nearly nine years old when he was placed with his foster family" and "had spent nearly all of his life living with [the mother]." The child expressed a desire "to be with [the mother] if at all possible." (*Ibid*.) Likewise, the child's court appointed special advocate reported "[the mother] and [the child] ha[d] a very close relationship and it would be detrimental to [the child] for their relationship to be disrupted." (*Ibid*.) Though we have no doubt Mother and M.C. share a loving relationship, the evidence in this case does not show their bond reaches the same level as the above cases.

III

DISPOSITION

The juvenile court's order is affirmed.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

FYBEL, J.

10