Filed 3/9/22  In re M.M. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>M.B.,<br><br>    Defendant and Appellant. | G060653<br><br>(Super. Ct. No. 18DP0852)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Isabel Apkarian, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*        \*        \*

M.M. (the child) was removed from M.B.'s (the mother) care when he was a few days old. The court eventually ended reunification services for her and set a hearing to terminate her parental rights under Welfare and Institutions Code section 366.26.[1] At that hearing, she argued for application of the parental-benefit exception (§ 366.26, subd. (c)(1)(B)(i)). The court found it did not apply and terminated her parental rights. She appeals this decision. We affirm the order because the court's finding that she inconsistently visited the child is supported by substantial evidence. She has also failed to show termination of her parental rights would be detrimental to the child.

I

FACTS AND PROCEDURAL HISTORY

A.    *Removal from the Mother's care*

The material facts of this case are undisputed. Since the child's father does not appeal, we focus on the facts pertinent as to the mother. The mother gave birth to the child in August 2018. A few days later, the Orange County Social Services Agency (SSA) filed a petition requesting that he be removed from his parents' care based on the following allegations: (1) she had unresolved anger management issues and had been diagnosed with schizophrenia and bipolar disorder and was not taking medication; (2) the child had lost considerable weight and his father was preventing her from breastfeeding him; (3) unresolved domestic violence issues between her and father; (4) her criminal history which included battery against a police officer and obstructing/resisting an executive officer; and (5) another of her children (the child's half-sibling) had previously been a dependent of the juvenile court before being freed for adoption in March 2017. The court issued a protective custody warrant, and the child was removed from his parents' care less than a week after his birth.

_____

[1]   All further undesignated statutory references are to the Welfare and Institutions Code.

2

At the detention hearing, the juvenile court found SSA had made a prima facie case, and it ordered the child be detained under SSA's protection. The child was placed in a foster home in September 2018, and he has remained with those same foster parents to this day. At later hearings, the court found the allegations in SSA's petition to be true and declared the child a dependent of the court. The mother was granted reunification services and monitored visitation.

B.    *Initial Reunification Period*

During the first 12 months of reunification, the mother participated in parenting education classes, a support program to address her mental health issues, and other service programs. She also participated in individual therapy once a week. Psychological evaluations, however, found she would have difficulty fulfilling her parental duties.

During visits, the mother was attentive, affectionate, and saw to the child's basic needs. She talked, sang, read, and played with the child. Still, she regularly missed visits. In November and December 2018, she missed four out of 12 combined visits. She made all her visits in January 2019, but missed two out of 10 visits in February and then missed 10 out of 12 visits in March. When SSA talked to her in April 2019, she acknowledged being "'gone for a while'" and disclosed she was having "suicidal thoughts but no plans of action." She also expressed her love for the child and that she was doing the best she could.

The mother's visitation record improved in April and May of 2019, as she only missed one visit across both months. In June, though, she only attended two visits with the child and missed four others. Her visitation was put on hold by the visitation agency and had to be reinstated due to too many missed visits. She then missed four more visits in July while attending three others.

The mother missed another visit in August. It was her 11th missed visit with that particular visitation agency, and she was warned that her referral would be terminated after another missed visit. The visitation agency also explained that upon termination, she would have to submit a new referral and there would be a waiting period before supervised visits could resume again. She made all her remaining visits in August. But no visits occurred in September. On September 3, 2019, she called to cancel a visit, explaining a close friend had passed away and she was too sad to attend. The visitation coordinator informed her that this would be her 12th canceled visit and, per policy, could not be rescheduled. She was again advised that if she did not attend this visit, her referral would be closed and it would have to be started again. The mother said she would not attend and would restart the referral process. A new visitation referral was submitted the next day requesting supervised visits for her.

SSA's final report prior to the 12-month review hearing stated that "[d]espite the mother's continued expressions to being committed to the child and addressing the issues that brought the child to the attention of the Court, it appears that she continues to put her own needs and priorities ahead of her child. The mother's efforts in her case plan activities continue to be minimal and in the last month she has continued to cancel her visits last minute and/or simply has not showed up to the scheduled visits."

At the 12-month review hearing on October 8, 2019, the juvenile court terminated reunification service for the child's father. As to mother, the court observed that there had "been a significant lapse of visitation." But it found she had engaged with other services and made personal progress. The court extended the mother's time for additional services, and it ordered a psychological evaluation for her under Evidence Code section 730 (the 730 evaluation).

4

*C.* *Reunification Services Terminated*

The mother participated in therapy services from July 2019 through October 2019, when those services were terminated. She was inconsistent with her therapy attendance. When SSA inquired about extending the referral, the therapist stated she could not help mother at this time. Rather, the therapist opined "mother should be receiving more specialized care[,] such as that provided by a psychiatrist, as well as medication management."

In December 2019, the mother told SSA she was on medication for her anxiety and depression. She also divulged "that she ha[d] been recently seeing the devil," and had talked to him as well. Her psychiatrist then gave her medication to prevent hallucinations. The following month, the biological father of her oldest child (the child's half-sibling) passed away. This upset her, and she was hospitalized for suicidal ideation. She also revealed to SSA that she had stopped taking her medications but planned to resume them. A psychiatric 730 evaluation was performed on her in March 2020. The report disclosed that she had been hospitalized more than 20 times and had been previously diagnosed with a developmental disability and bipolar disorder, schizophrenia, anxiety, and psyc hosis. While the psychiatrist did not believe she would abuse the child, he found her "risk to potentially be neglectful toward her child . . . [was] moderately high."

As to visitation, SSA's reports stated that the "mother's visitation with the child ha[d] been inconsistent." After the visitation referral was terminated in September 2019, visitation resumed in November 2019 (i.e., no visits occurred in September or October 2019). However, she only had two visits with the child in November, and she canceled several other visits that month. Likewise, she canceled all her visits the first two weeks of December 2019.[2] In the second half of the month, she attended four visits

---

[2] The mother "indicat[ed] that due to the cold weather she would not be attending visits because she did not want to get sick."

and missed four others. She only saw the child once in January 2020, canceling a dozen other visits.

It does not appear any visits occurred in February 2020. The child was sick for part of the month. And when he was healthy, the mother canceled her visits, leading to her referral being closed a second time due to having missed or canceled 12 visits. A new referral was again submitted. SSA's reports did not document any visits in March. The mother was sick for a portion of the month, then visitation centers ceased in-person visits due to the COVID-19 pandemic.

After the onset of the pandemic, the mother agreed to video visits of 30 minutes in length several days a week. She attended the vast majority of these video visits, only missing one virtual visit through the end of August 2020. But she was frequently late to calls, showing up "anywhere from two minutes to 15 minutes late," and she commonly ended the visits a few minutes early. SSA's reports also noted that she appeared distracted during several visits and had to be directed to provide the child's attention.

In-person visitation resumed in late September 2020. The mother attended one in-person visit that month. She then canceled her other visits in September and October due to multiple illnesses. Further, due to COVID-19 protocols, she was required to wait two weeks before rescheduling in-person visits after reporting each illness. As such, all visitation in September and October 2020 occurred over video, except for the one in-person visit previously described.

During in-person visits, the mother was attentive to the child, and he seemed comfortable with her. She changed his diapers and fed him. They played with toys, and she helped him use a walker and tricycle. She talked with him and provided him direction and support when needed. The child also appeared to look to mother for comfort and reassurance at times. After in-person visitation resumed during the COVID-19 pandemic, the child took some time to warm up to mother but still appeared

6

comfortable around her. On video calls, she showed toys to the child, attempted to converse with him, and sang songs to him. She prompted him to say please and thank you and be nice to others. She encouraged the child and told him that she loved him and missed him.

At the 18-month review hearing on October 30, 2020, the mother's reunification services were terminated, and the juvenile court set a hearing to terminate her parental rights under section 366.26. She was granted 15-minute remote visits five times per week and six hours of in-person visits a week.

## D. *Termination of Parental Rights*

SSA's reports indicated the child had been with his foster parents for two-and-a-half years. He had formed a close relationship with them, and they wished to adopt him. As for the mother, she gave birth to another child in April 2021, but that child was also placed in protective custody shortly after birth.

After reunification services were terminated, the mother continued to have video calls with the child five days a week and in-person visits once a week. SSA's reports did not contain many details about these visits. They generally stated the visits were positive and that she attempted to engage the child in play. But they also reported that she continued to log in to video calls late and ended in-person visits early.

The mother's in-person visitation also remained inconsistent. SSA's report from May 2021 documented that she "ha[d] not been consistent with her visits with [the child]." It also stated she "ha[d] canceled the last few visits due to being sick" and "that during supervised [video] visits, [the child could] handle only 15 minutes of the 30-minute visit." In June 2021, SSA again reported that she "ha[d] not been consistent with her visits with [the child] and ha[d] canceled or postponed many visits." She was also "usually late to her visits or cuts her visits short." The report also contained observations from a visitation monitor that mother had difficulty engaging with the child at times and

7

that he would walk away from her and not speak to her. In such situations, the visitation monitor found "[the child became] very happy when his care providers pick him up from the visit." Finally, the monitor expressed that she "[did] not believe that [the child was] bonded with [the mother]." For example, during one visit in June 2021, "[the child] appeared shy and timid when he arrived to [the visit]. [She] made several attempts to hug [the child] but the hugs were not reciprocated to [her]. [The child] did not appear happy and had very little engagement with [her]." In another visit in July 2021, she prompted the child for a kiss but he would not give her one.

SSA's visitation notes reflected that the mother did not show up at four of 10 scheduled in-person visits between June and August 2021.

At the section 366.26 hearing on August 24, 2021, the mother's parental rights were terminated and the child was freed for adoption. She argued against termination based on the parental-benefit exception, but the juvenile court found it inapplicable. First, it ruled there had been inconsistent visitation between her and the child. Second, even if visitation had been regular, it concluded the benefit of keeping the biological parent bond intact did not outweigh the permanency and benefits of adoption.

The mother appeals this order, arguing the juvenile court erred by failing to apply the parental-benefit exception. We disagree and affirm the order.

II

DISCUSSION

"[T]he goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.' [Citations.] To guide the court in selecting the most suitable permanent arrangement, [section 366.26] lists plans in order of preference and provides a detailed procedure for choosing among them. . . . According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has

8

been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption.  [Citation.]  But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan.  [Citation.]  As we have previously explained, '[t]he statutory exceptions merely permit the court, in *exceptional* circumstances [citation], to choose an option other than the norm, which remains adoption.'"  (*In re Caden C.* (2021) 11 Cal.5th 614, 630-631, italics added (*Caden C*).)

The exception at issue here, the parental-benefit exception, "is limited in scope."  (*Caden C.*, *supra*, 11 Cal.5th at pp. 631-632.)  To establish this exception, a parent must prove three elements by a preponderance of the evidence:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*Id*. at pp. 631, 636-637.)  The juvenile court found the mother had not shown any of these elements.  We begin with the court's finding that she failed to show the first element – regular visitation and contact – and conclude it is supported by substantial evidence.

"The first element . . . is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'  [Citation.]  Visits and contact 'continue[] or develop[] a significant, positive, emotional attachment from child to parent.'  [Citation.]  Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' [citation] but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact — here, as throughout, the focus is on the best interests of the child."  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

A juvenile court's findings on the first element are reviewed under the substantial evidence standard.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)  Typically,

9

this test is applied "when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) However, the test operates differently where, as here, "the issue on appeal turns on a failure of proof at trial." (*In re I.W.*, at p. 1528.) In this scenario, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Ibid*.)

The mother has not met this heavy burden on appeal. The undisputed evidence set forth above shows mother failed to regularly visit the child throughout this entire dependency case. Indeed, her visitation referral was put on hold once and closed twice for missing too many visits. Excluding the period of the COVID-19 pandemic where in-person visits were not allowed, there were numerous months when she had two or less in-person visits with the child. For example, nothing in the record shows any visits (in-person or virtual) occurring in September or October 2019, after her referral was terminated the first time. Similarly, from January through the end of March 2020, there is only one documented visit (in-person or virtual) between her and the child. She canceled 12 visits in January 2020 alone, leading to her visitation referral being closed a second time. Given the child's young age, it is not unreasonable to infer that missing entire months of visitation interfered with his ability to form a significant, positive, emotional attachment to her. (See *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1105 ["[S]ubstantial evidence standard of review requires us to resolve all conflicts and draw all reasonable inferences from the evidence in favor of the trial court's order"].) Thus, the undisputed evidence is insufficient to compel a

finding as a matter of law that the mother had enough regular visitation and contact with the child to fulfill the first element.

In response, the mother argues she visited the child as much as her physical and mental health permitted. But she cites no case law showing these factors are considered when evaluating whether regular visitation and contact occurred. Nor do they appear to be relevant here. When evaluating this element, our focus is not on the parent but on the interests of the child. The analysis it not meant "to punish parents or reward them for good behavior in visiting or maintaining contact." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Rather, the purpose of this requirement is to ensure children have the visitation necessary to build a significant emotional connection to their parent. (See *ibid*.) Given this context, our focus is not on the mother's reasons for missing visits but on the impact the missed visits had on the child. To a young child like him, the reasons for the missed visits are irrelevant. Each missed visit deprived him of an opportunity to bond with the mother, regardless of the reason the visit was missed.

This conclusion is bolstered by our Supreme Court's characterization of the first element as "straightforward" and only asking whether "'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Here, reviewing the reasons behind the mother's missed visits would turn this straightforward question into a complex inquiry. To evaluate this argument, we would have to review the varying reasons behind the many missed visits and determine which visits were missed due to her physical or mental health. For the visits that were missed due to a claimed health issue, we would then have to probe deeper and analyze whether the physical or mental health issue was severe enough to justifiably preclude her from visiting the child. Only after sorting the missed visits into various buckets would we then be able to analyze whether she visited as much as her physical and mental health permitted and whether those visits were sufficient to constitute regular visitation. Based

11

on our reading of *Caden C.*, this is not what the Supreme Court envisioned when evaluating the first element. (See *ibid.*)

Even if we found the mother had met the first two elements, she has not shown the juvenile court erred in ruling against her on the third element. In evaluating this element, the court "decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at pp. 633-634.) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due* to' the child's beneficial relationship with a parent." (*Ibid.*) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id*. at p. 634.)

In conducting this analysis, we note the parental-benefit exception is applied cautiously. "'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) To depart from this legislative preference, a "'parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child.'" (*In re A.G.* (2020) 58 Cal.App.5th 973, 995.) "[T]his type of relationship typically arises from day-to-day interaction, companionship and shared experiences, and may be continued or developed by consistent and regular visitation after the child has been removed from parental custody." (*In re S.B.* (2008) 164 Cal.App.4th 289, 298-299, italics omitted.)

Two standards of review are applied to this element. The juvenile court's findings of fact are reviewed under the substantial evidence standard. But "the ultimate decision — whether termination of parental rights would be detrimental to the child due

12

to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*,11 Cal.5th at p. 640.) "An abuse of discretion is only demonstrated when no reasonable judge could have made the challenged order." (*In re Marriage of Barth* (2012) 210 Cal.App.4th 363, 374.)

Here, the juvenile court acted within its discretion. The child was removed from the mother's custody when he was only a few days old. Thus, he never had the day-to-day experiences with her that would typically create the deep bond needed to invoke the parental-benefit exception. Also, nothing in the record convincingly shows he formed such a bond with her through visitation. As set forth above, she failed to consistently visit the child. While SSA's reports showed she and the child shared some pleasant visits together, particularly earlier in this dependency case, reports from visits just prior to the section 366.26 hearing revealed she had difficulty engaging with the child during in-person visits. We have no doubt the two share an emotional bond. But nothing in the record shows the child's bond with the mother is so strong that the interest in keeping it intact outweighs the benefits he would obtain from adoption. (See *Caden C.*, *supra*, 11 Cal.5th at p. 634.)

### III

### DISPOSITION

The juvenile court's order terminating mother's parental rights is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.